Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES

```
 1                  IN THE UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                        ORLANDO DIVISION

 3

 4    JONATHAN HUMPHRIES and
      ROMAN FELIX,
 5
             Plaintiffs,
 6
      vs.                          Case 6:16-cv-00109-GAP-KRS
 7

 8    HARTFORD SOUTH, LLC, a
      Florida Limited Liability Company,
 9
             Defendant.
10

11

12        _____/

13
      DEPOSITION OF:    JONATHAN HUMPHRIES
14
      DATE:             Thursday, October 13, 2016
15
      TIME:             10:07 a.m. - 1:14 p.m.
16
      TAKEN BY:         Defendant
17
      PLACE:            Holland & Knight, LLP
18                      200 South Orange Avenue
                        Suite 2600
19                      Orlando, Florida 32801

20    REPORTED BY:      Sara Miller, Notary Public
                        State of Florida
21

22

23

24

25
```



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 2 of 145 PageID 164

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          2

```
 1                    A P P E A R A N C E S:

 2   KIM DE ARCANGELIS, ESQUIRE
     OF:  Morgan & Morgan, P.A.
 3        20 North Orange Avenue
          14th Floor
 4        Orlando, Florida 32801
          407.420.1414
 5        KimD@forthepeople.com

 6        On behalf of the Plaintiff

 7

 8   STEPHEN T. BALL, ESQUIRE
     OF:  Holland & Knight
 9        200 South Orange Avenue
          Suite 2600
10        Orlando, Florida 32801
          407.244.1140
11        Stephen.ball@hklaw.com

12        On behalf of the Defendant

13

14

15   ALSO PRESENT:
     Peter Rintelmann, Hartford South
16

17

18

19

20

21

22

23

24

25
```



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 3 of 145 PageID 165

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    3

```
 1                    I N D E X

 2   TESTIMONY OF JONATHAN HUMPHRIES

 3        Direct Examination by Mr. Ball..............4

 4   CERTIFICATE OF OATH..............................131

 5   REPORTER'S DEPOSITION CERTIFICATE................132

 6   ERRATA SHEET.....................................133

 7   NOTIFICATION LETTER..............................134

 8

 9

10

11                  E X H I B I T S

12   Exhibit No. 1.....Background Check................13

13   Exhibit No. 2.....Application.....................38

14   Exhibit No. 3.....Identification Card.............41

15   Exhibit No. 4.....Payroll Records.................50

16   Exhibit No. 5.....Answers to Interrogatories......111

17

18

19

20              S T I P U L A T I O N S

21        It is hereby stipulated and agreed by and between

22   counsel present for the respective parties, and the

23   deponent, that the reading and signing of the deposition

24   are hereby RESERVED.

25
```



**Orange Legal**
**800-275-7991**

Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 4 of 145 PageID 166

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    4

```
 1                    P R O C E E D I N G S
 2              THE COURT REPORTER:  Do you swear or affirm
 3        that the testimony you are about to give will be
 4        the truth, the whole truth, and nothing but the
 5        truth?
 6              THE WITNESS:  Yes.
 7                   JONATHAN HUMPHRIES,
 8         Having first been duly sworn, was examined
 9        and testified as follows:
10                   DIRECT EXAMINATION
11  BY MR. BALL:
12        Q.    Would you state your full name for the
13  record, please?
14        A.    Jonathan Humphries.
15        Q.    No middle name?
16        A.    Bakari.
17        Q.    Can you spell that?
18        A.    B-a-k-a-r-i.
19        Q.    And what is your address, Mr. Humphries?
20        A.    4714 Baywillow Court.
21        Q.    Baywillow?
22        A.    Mm-hmm.
23        Q.    Is that all one word?
24        A.    Yes.
25        Q.    And is that Orlando?
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          5

```
 1        A.    Yes.

 2        Q.    And the zip?

 3        A.    32808.

 4        Q.    And do you have a phone number?

 5        A.

 6        Q.    Is that a cell or a home phone?

 7        A.    Cell phone.

 8        Q.    And your date of birth?

 9        A.

10        Q.    And are you married, Mr. Humphries?

11        A.    No.

12        Q.    Have you ever been married?

13        A.    Once.

14        Q.    And when was that?

15        A.    About '97.

16        Q.    How long were you married?

17        A.    For about seven, eight months.

18        Q.    Have any children?

19        A.    No.

20        Q.    Have you ever had your deposition taken

21   before?

22        A.    Mm-hmm.

23        Q.    Is that a yes?

24        A.    Yes.

25        Q.    Okay.  One thing that -- let me go over some
```

1    ground rules with you, and then I'll ask you about that

2    deposition so it makes it easier for the court reporter

3    here.  I'm going to be asking you questions about your

4    lawsuit this morning and you're going to be answering my

5    questions.  She's going to be taking down my questions

6    and your answers verbatim, so it's important that you

7    and I not be talking at the same time for her sanity

8    because she's trying to record this as we go along by

9    typing down the transcript.  Things like uh-huh and

10   huh-uh don't show up on the record well, so if you can

11   answer it with an uh-huh, if you can answer yes or an

12   uh-uh if you can answer no, that would be helpful.  If

13   you don't understand a question, please let me know and

14   I'll try to rephrase the question for you.  Otherwise if

15   you answer a question, I will presume you have

16   understood it.  Is that fair enough?

17        A.    Yes.

18        Q.    Okay.  You say you have had your deposition

19   taken before.  When was that?

20        A.    If I'm not mistaken, that is what I did when

21   I talked to her -- well, the other people the first

22   time, right, or that was just conversation?

23             MS. KIM DE ARCANGELIS:  No.  This is

24        different.

25



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    7

```
 1  BY MR. BALL:

 2       Q.    Yeah.  I'm talking about where you have a

 3  court reporter --

 4       A.    No.

 5       Q.    -- like this.

 6       A.    No.  None of that.

 7       Q.    Have you ever had that?

 8       A.    No.

 9       Q.    How long have you lived at your current

10  address on Baywillow Court?

11       A.    About five or six years.  I'm not really

12  sure.

13       Q.    Does anyone live with you currently at the

14  Baywillow address?

15       A.    My nephew.

16       Q.    And what is his name?

17       A.    Is that necessary?

18       Q.    Yes, sir.

19            MS. KIM DE ARCANGELIS:  You have to answer

20       the questions unless I tell you not to answer.

21            THE WITNESS:  Terrance Baker.

22  BY MR. BALL:

23       Q.    T-e-r-r-a-n-c-e?

24       A.    Any way you want to spell it.

25       Q.    I'm asking you how it's spelled, sir.
```



```
 1          A.    It's not my child.  It's my nephew.
 2          Q.    Well, I presume you know --
 3          A.    I don't know.
 4          Q.    You don't know how to spell your nephew's
 5   name?
 6          A.    No.  I don't know how she spell it.
 7          Q.    It's a she?
 8          A.    Well, his mother named him.
 9          Q.    Okay.  Let me stop for just a second.  We're
10   not here to try to antagonize you at all.
11          A.    Not antagonizing, but you're asking a lot of
12   stuff and I'm trying to give you the reason why I don't
13   know.
14          Q.    Okay.  That's fair enough.  How old is
15   Terrance Baker?
16          A.    Terrance is probably about 23 now.
17          Q.    And how long has he lived with you?
18          A.    For probably about two or three years.
19          Q.    Was he living with you when you were working
20   at Hartford South?
21          A.    Yeah.
22          Q.    Anyone else lived with you since the time
23   you worked with Hartford South until today besides your
24   nephew?
25          A.    Yes, my mother.
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                                    9

```
 1      Q.   And what is her name?

 2      A.   Mamie.

 3      Q.   M-a-m-i-e?

 4      A.   Mm-hmm.

 5      Q.   You need to answer yes or no, sir.

 6      A.   Yes.

 7           MS. KIM DE ARCANGELIS:  Because when she --

 8    uh-huh looks the same.

 9  BY MR. BALL:

10      Q.   And what is your mom's last name?

11      A.   Humphries.

12      Q.   Humphries.  Anyone else live with you from

13    the time that you began work with Hartford South until

14    the present other than your nephew and your mother?

15      A.   No.

16      Q.   Have you ever been a plaintiff or a

17    defendant in a lawsuit before?  Have you ever been

18    involved in a lawsuit before?

19      A.   Probably, yes.

20      Q.   And what was that about?

21      A.   I can't recall.

22      Q.   Did you ever sue anyone?

23      A.   I think so.

24      Q.   And what was that about?

25      A.   Probably if I'm not mistaken, okay, I had a
```

Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 10 of 145 PageID 172

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    10

1    back injury during a hurricane.

2         Q.    And who did you sue?

3         A.    A company named Air Flow.

4         Q.    Air Flow?  Was that your employer?

5         A.    Yes.

6         Q.    And when did this occur?

7         A.    I'm not sure, but I know it was the last

8    hurricane before this one.  Probably like 2005 or 2004,

9    somewhere up in there.

10        Q.    And was that lawsuit filed in Orange County?

11        A.    I think so.

12        Q.    Any other lawsuits?

13        A.    Not that I know of.

14        Q.    Have you ever been sued before?

15        A.    Not that I know of.

16        Q.    Have you ever been prosecuted before?

17        A.    Yeah.  Sure.

18        Q.    Tell me about that.

19        A.    Now that's a long history.

20        Q.    Okay.  Go ahead.

21        A.    '93 throughout probably about right about

22    2007.

23        Q.    And between '93 and 2007, what were you

24    prosecuted for?

25        A.    The first thing?



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                      11

```
 1        Q.     Yes.

 2        A.     I was prosecuted for supposedly an armed

 3   robbery.

 4        Q.     And were you convicted?

 5        A.     Yes.

 6        Q.     Did you serve time?

 7        A.     Yes.  Later on the case was overthrown.

 8        Q.     So you say you were convicted of armed

 9   robbery and later the case was --

10        A.     Overthrown.

11        Q.     Overturned?

12        A.     Yes, overturned.

13        Q.     So you did not spend any time in jail or you

14   did?

15        A.     I spent time in jail.  I spent time in

16   prison too.

17        Q.     How long was that?

18        A.     About three years.

19        Q.     Okay.  After that -- and when did that take

20   place, that armed robbery or alleged armed robbery?

21        A.     Ninety-three.

22        Q.     Okay.  How about the next one?

23        A.     Like I said, I can't remember the order all

24   of that stuff goes but...

25        Q.     Okay.  Tell me what you recall.
```

1       A.    Driving on suspended license.  Failure to

2   pay court fines.  A domestic violence that was never

3   processed.

4       **Q.    When was the domestic violence charge?**

5       A.    I think that was probably about 2007.

6       **Q.    Were you convicted of that?**

7       A.    No.  It was never processed.

8       **Q.    Okay.  You were just arrested for it?**

9       A.    Yes.

10      **Q.    What else?**

11      A.    I don't know.  It could be anything.

12      **Q.    Tell me what else you can recall.**

13      A.    I think I did get a trespass one time.

14      **Q.    When was that?**

15      A.    I don't know what year or what date.  I

16   don't know.

17      **Q.    Okay.  Was that a trespass against a**

18   **business, a person's dwelling?**

19      A.    I think it was a person's dwelling.

20      **Q.    Who was the person?**

21      A.    I don't know, but it didn't get prosecuted.

22      **Q.    All right.  What else?**

23      A.    I don't know.  I can't -- you're telling me

24   to recall '93 to 2007.  That's a long time.

25            MR. BALL:  Let's mark this as Defendant's 1.

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          13

```
 1              (Defendant's Exhibit No. 1 was marked for

 2        identification.)

 3  BY MR. BALL:

 4        Q.    What I've shown you as Defendant's Exhibit

 5  1, which is a background check that was done when you

 6  were first employed by Hartford South.

 7        A.    Mm-hmm.

 8        Q.    And the first offense there, the robbery

 9  with the firearm, which I believe you told me about

10  already, and that looks like 1994?

11        A.    No.  It was '93 but they sentenced me in

12  '94, so they held me until I got old enough.

13        Q.    Okay.  And then there was a second one,

14  shooting or throwing a missile into a dwelling

15  structure?

16        A.    Which is the same thing.  It's all in the

17  same case.

18        Q.    Okay.  And then down there is first degree

19  murder?

20        A.    Well, that, like I said, it got overturned.

21  All of that got thrown out which makes it hard for me to

22  make a living.

23        Q.    Right.  And then the last one is a concealed

24  weapon, and all of those were at the same time?

25        A.    Yes.
```



```
 1        Q.    Did someone --

 2        A.    Same case.

 3        Q.    Okay.  Did someone get shot?

 4        A.    Yep.

 5        Q.    Can you tell me the circumstances behind

 6   that?

 7        A.    The circumstances?

 8        Q.    Yes, sir.

 9        A.    What you mean?  Like what happened?

10        Q.    Yes, sir.

11        A.    I think what happened back then, we were

12   getting into a fight and the gun actually went off.

13        Q.    And went into someone's house?

14        A.    Well, we were already in the house.

15        Q.    Okay.

16        A.    So that's why it was an occupied dwelling.

17        Q.    And someone was killed?

18        A.    No.

19        Q.    That's what I can't tell from this.  Is it

20   first degree murder or first degree attempted murder?

21        A.    I don't know.

22        Q.    I see the word attempt there so --

23              MS. KIM DE ARCANGELIS:  Are you saying --

24   oh, okay.

25
```



```
 1  BY MR. BALL:

 2       Q.    So no one was killed?

 3       A.    (Witness shakes head).

 4       Q.    You need to answer audibly, sir.  No one was

 5  killed?

 6       A.    I think that says attempted.

 7             MS. KIM DE ARCANGELIS:  But he says no one

 8       was killed, yes or no?

 9             THE WITNESS:  No.

10  BY MR. BALL:

11       Q.    Okay.

12             MS. KIM DE ARCANGELIS:  It's a tough copy to

13       read.

14             MR. BALL:  It is.

15             MS. KIM DE ARCANGELIS:  Does that say

16       acquitted jury next to it?  Is that what that says?

17             MR. BALL:  Yes.

18             MS. KIM DE ARCANGELIS:  Okay.

19  BY MR. BALL:

20       Q.    For purposes of the deposition today, when I

21  refer to your employer that you sued, I'm going to call

22  it Hartford South.  Is that fair enough?

23       A.    Yes.

24       Q.    Thank you.  With the exception of Hartford

25  South, have you ever made any complaints or complained
```

Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 16 of 145 PageID 178

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    16

```
 1   to any other employer that you've ever worked for about
 2   wage and hour violations not being paid overtime?
 3        A.   Never.
 4        Q.   With the exception of Hartford South, have
 5   you ever made any complaints or complained to any other
 6   employer about what you consider to be unlawful conduct
 7   in the workplace?
 8        A.   Never.
 9        Q.   Any kind of discrimination or anything of
10   that nature?
11        A.   Never.
12        Q.   Okay.
13        A.   When you say what you just said, you mean
14   me, myself?
15        Q.   Yes.
16        A.   Okay.
17        Q.   Did you finish high school, Mr. Humphries?
18        A.   No.  I got a GED.
19        Q.   And when was that?
20        A.   It was about '98.
21        Q.   Was that here in the local area?
22        A.   It was in jail.
23        Q.   But in the local area here?
24        A.   Yes.
25        Q.   Orlando.  And you say that was while you
```



Case 6:16-cv-00109-GAP-KRS  Document 31-1  Filed 01/03/17  Page 17 of 145 PageID 179

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    17

```
 1  were in jail?

 2        A.    Yeah.

 3        Q.    Besides your GED --

 4        A.    It might have been '96.

 5        Q.    Okay.

 6        A.    I was still incarcerated so...

 7        Q.    All right.  Besides your GED, have you had

 8  any other post high school education of any kind?

 9        A.    I went to Seminole Community College for

10  HVAC.  I went for about two years.

11        Q.    And when was that?

12        A.    That happened about 2007, 2008.

13        Q.    And did you receive any type of degree or

14  certificate from that?

15        A.    I got one as a sheet metal mechanic and

16  fabrication.

17        Q.    And is that a certificate or a license?

18        A.    I think it's a certificate.

19        Q.    Is that something you have to keep current?

20        A.    I haven't been up on it, but I got the

21  paper.

22        Q.    But is it something that if you don't keep

23  current on it, it expires?

24        A.    No.  It's just like a certificate of

25  completion or whatever.
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                                    18

1        Q.     All right.  Any other type of training or

2   certificates of any kind?

3        A.     I have training, but I don't have any

4   certificate as far as a tree surgeon.

5        Q.     What training did you have as a tree

6   surgeon?

7        A.     I was a tree surgeon, tree climber.

8        Q.     Was that on-the-job training?

9        A.     Yes.  I got an uncle that owned his own

10   business, and when we were younger, he'd take us and we

11   learned that.

12        Q.     Any other degrees or certificates of any

13   kind, training?

14        A.     No.

15        Q.     Ever been in the military?

16        A.     No.

17        Q.     Are you currently employed?

18        A.     Yes.

19        Q.     And who is your employer?

20        A.     Steak 'n Shake.

21        Q.     And which location?

22        A.     OBT by the Super Wal-Mart.

23        Q.     What's the store number?

24        A.     I don't know.

25        Q.     And what is your position with Steak 'n



 1   Shake?

 2        A.    Cook.

 3        Q.    How long have you been employed by Steak 'n

 4   Shake?

 5        A.    About a month.

 6        Q.    I'm sorry?

 7        A.    Let's see.  This is the third week.

 8        Q.    Three weeks?

 9        A.    Yeah.

10        Q.    And who is your supervisor?

11        A.    Stephanie.

12        Q.    Stephanie.  And I want to work backwards

13   from Steak 'n Shake.  What was the employer that you had

14   immediately before Steak 'n Shake?

15        A.    Before Steak 'n Shake, B&D Enterprises.

16        Q.    B&D Enterprises?

17        A.    Mm-hmm.

18        Q.    You need to answer yes or no.

19        A.    Yes.

20        Q.    And what kind of business is B&D

21   Enterprises?

22        A.    Underground construction.

23        Q.    Underground construction?

24        A.    Yeah, like pipe cleaning and all that.

25        Q.    Okay.  And when did you work with B&D

Case 6:16-cv-00109-GAP-KRS  Document 31-1  Filed 01/03/17  Page 20 of 145 PageID 182

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                           20

 1   Construction (sic)?

 2        A.    2013 to 2014, right before I went to

 3   Hartford South.  And I worked for them again for I think

 4   about four or five months out of this year.

 5        Q.    And that's in 2016?

 6        A.    Mm-hmm.

 7        Q.    You need to answer yes or no, sir.

 8        A.    Yes.

 9        Q.    So you worked for them for four or five

10   months in 2016 as well?

11        A.    Yes.

12        Q.    And what type of work did you do for B&D

13   Enterprises?

14        A.    What it is, cleaning underground pipe,

15   sanitary, and your storm drainage and some repairs.

16        Q.    Besides B&D Enterprises and Steak 'n Shake,

17   have you worked for any other business since you left

18   Hartford South?

19        A.    Yeah, but not as far as in corporate

20   business and things like that.

21        Q.    Not in terms of what?

22        A.    Not as far as like in big business.

23        Q.    Well, what else have you done?  You're

24   talking about like work for your uncle?

25        A.    Yeah, stuff like that.  I got family members



```
 1    that...

 2         Q.    So odd jobs?

 3         A.    Yeah, you can say that.

 4         Q.    When you were working with Hartford South,

 5    were you doing any other work at the time that you

 6    worked for Hartford South, working for anybody else,

 7    doing jobs on the side?

 8         A.    Yeah.

 9         Q.    Okay.  And when you were working with

10    Hartford South, what other kinds of jobs or work were

11    you doing?

12         A.    Tree work, AC work, some lawn care.  I have

13    a few people I take care of their gardens.  Other

14    miscellaneous.

15         Q.    Okay.  Besides Hartford South, have you ever

16    been terminated from employment by any employer?

17         A.    No.  And I don't think I was terminated.

18         Q.    Well, I just said besides Hartford South,

19    leaving Hartford South out of it, have you ever been

20    terminated by any employer?

21         A.    I've been, what do you call it, let go

22    because of a piss test, yeah.

23         Q.    Because of a --

24         A.    Piss test.

25         Q.    Where was that?
```



1         A.     I think that was Air Flow.

2         Q.     **Was that a random drug test or was that as a**

3    **result of an injury?**

4         A.     A back injury.

5         Q.     **Any other employers that you've been asked**

6    **to leave employment?**

7         A.     No, not that I can remember.

8         Q.     **When did you first become employed by**

9    **Hartford South?**

10        A.     October 28th, 2014.

11        Q.     **And how did that come about?**

12        A.     What do you mean?

13        Q.     **How did you end up --**

14        A.     How did I get the job?

15        Q.     **Yeah.  How did you end up being employed by**

16   **them?**

17        A.     I went there looking for a job after B&D,

18   filled out an application and had some roofing

19   experience as far as residential.  I think I informed

20   him of that and he said he wants to give me a shot.

21        Q.     **Did you know anyone at Hartford South?**

22        A.     Not really.  I knew a guy that moved in the

23   neighborhood that knew of the place, like shared

24   information about how to get work if anybody's hiring.

25        Q.     **But no one that worked at Hartford South?**



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                      23

```
 1        A.    Yeah, he worked there.

 2        Q.    What was his name?

 3        A.    Jeff.

 4        Q.    Last name?

 5        A.    I'm not sure.  I didn't know him like that.

 6   I just knew him from the neighborhood.

 7        Q.    He lived in your neighborhood?

 8        A.    Yeah.

 9        Q.    Did anyone interview you for a position at

10   Hartford South?

11        A.    I think Misty, yeah.

12        Q.    Misty?

13        A.    Yes.

14        Q.    And what position did Misty hold at Hartford

15   South?

16        A.    I guess human resources.

17        Q.    But it was an inside -- she had an inside

18   job?

19        A.    Yes.

20        Q.    Anyone besides Misty interview you?

21        A.    Not really.  I talked to Dennis.

22        Q.    Dennis Lovett?

23        A.    Yeah, I talked to him, but I wasn't

24   interviewed.

25        Q.    Any foreman interview you?
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    24

```
 1        A.    No, not that I know.

 2        Q.    No?

 3        A.    No.

 4        Q.    Do you know who reviewed your application?

 5        A.    No.

 6        Q.    Were you hired on the same day you filled

 7  out your application?

 8        A.    Yes.

 9        Q.    Or did you turn it in --

10        A.    I think I was hired, yeah, same day.  I came

11  back the next day.

12        Q.    Who did you turn your application in to when

13  you filled it out?

14        A.    You know, I think I filled it out and gave

15  it to Dennis and he took it in the back.

16        Q.    Is the Jeff that you're referring to earlier

17  Jeff Brokenborough?

18        A.    I don't know his last name.

19        Q.    Okay.  So you were then hired by Hartford

20  South?

21        A.    Yes.

22        Q.    For what position?

23        A.    I think a helper or something like that.  I

24  wasn't quite sure what he said it was, laborer or

25  something.  Something along those lines.
```

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          25

```
 1        Q.    But not as a full roofer?

 2        A.    No.

 3        Q.    Did you stay in that same position the

 4  entire time you were at Hartford South?

 5        A.    As far as I knew, pay didn't change.

 6        Q.    Who was your supervisor when you first

 7  started work with Hartford South?

 8        A.    Oh, boy, I don't know how that works.  I

 9  think Dennis is the supervisor, right?

10        Q.    Well, Dennis is the superintendent.

11        A.    Okay.

12        Q.    Who was your foreman maybe is a better word?

13        A.    Foreman, yes.  Joe.

14        Q.    Joe Thorne?

15        A.    Yeah.

16        Q.    T-h-o-r-n-e.  Did you have any other foremen

17  that you were on a crew with --

18        A.    Oh, yeah, sometimes we switched around, but

19  mainly it was Joe most the time.

20        Q.    Who else as a foreman did you work for, even

21  if for a short period of time?

22        A.    Diego.  I can't think of the other guy's

23  name.  I can't think of his name.

24        Q.    Did you ever work on Benny Davis' team?

25        A.    Once.  Once.  One day.
```



1       Q.    Did you ever work on Justin Lovett's crew

2   (sic)?

3       A.    No.  See, that would be a hard thing to

4   answer because there were times there you had two

5   foremans on one job so you -- I don't know how you would

6   say that.

7       Q.    Okay.  Well, did you ever work on --

8       A.    I worked with him before, yeah.

9       Q.    Okay.  When he was a foreman?

10      A.    I'm assuming he was a foreman, yeah.

11      Q.    All right.  Did you ever work on Walter's?

12      A.    I don't know who Walter is.

13      Q.    All right.  Did you ever work on Wally's?

14      A.    Now, see, like what you're saying is -- nah,

15  it didn't never work that way.  It was just like I told

16  you.

17      Q.    Well, I know.

18      A.    If I worked with him, it's because he was on

19  the job site with us.  It wasn't like we worked for him.

20      Q.    Okay.  So in other words, he would be on the

21  same job site as you and your team --

22      A.    The site --

23      Q.    Just let me finish my question so she's

24  not -- he would be there with his crew and you would be

25  there with another crew, but both crews would be working



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    27

```
 1   on the same job?

 2        A.    Yeah.

 3        Q.    Is that what you're telling me?

 4        A.    Yes.

 5        Q.    Okay.  But he has been on the same job site

 6   with you?

 7        A.    Yeah, once.

 8        Q.    Give me one second if you would.  Not a

 9   break, but give me 30 seconds.

10              How about Ricardo Hernandez?

11        A.    I don't know who that is.

12        Q.    You don't know who he is?

13        A.    For the time I stayed there, the people, if

14   they didn't work with Joe, I really wouldn't know their

15   actual name.  I knew probably about -- I knew Benny.  I

16   knew Diego.  I knew -- Benny, Diego, Wally, I knew him.

17   I knew of him.

18        Q.    Okay.  I'm just going to run through some

19   names with you and ask you do you ever recall working,

20   even if for a day on -- with a foreman by the name of

21   Ricardo Hernandez?

22        A.    No, I don't.  I can't say because I don't

23   know the name like that.  If you showed me a picture,

24   then we probably --

25        Q.    That's fine.  How about Nick Medina?
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                        28

 1        A.    Oh, boy, no, I don't -- you have to show me
 2    pictures because I don't know these people.  You got
 3    people that don't even speak English there.
 4        **Q.    How about Rico, does that name ring a bell?**
 5        A.    Yeah, I've heard of him.
 6        **Q.    All right.  How about Urbana Perez?**
 7        A.    Yeah, I know Urbana.
 8        **Q.    Have you ever worked on his crew?**
 9        A.    The first day I got there, that's the first
10    person they put me with.
11        **Q.    All right.  Jorge Perez or George Perez?**
12        A.    I think I know Jorge, yeah.
13        **Q.    Did you ever work on a crew with him?**
14        A.    Yeah, he was with Joe.  He was with our crew
15    for the week or two he worked there.
16        **Q.    But is it your testimony that for the lion's**
17    **share of the time that you worked at Hartford South, Joe**
18    **Thorne was your supervisor?**
19        A.    Yeah, unless it was one of the other guys.
20    Like I said, two out of the three.
21        **Q.    Right.  Now, you worked at Hartford South**
22    **from July -- excuse me, from October 28 of 2014 until**
23    **September 18 of 2015; is that correct?**
24        A.    I think so.
25        **Q.    Approximately how many job sites did you**



**Orange Legal**
**800-275-7991**

```
 1   work on during that time?

 2        A.    Oh, boy, you want a lot?

 3        Q.    Just --

 4        A.    I'm just asking because I never counted job

 5   sites.  And as long as it's been...

 6        Q.    Was there a lot of job sites that you worked

 7   on?

 8        A.    Yeah.

 9        Q.    More than ten?

10        A.    I would say more than ten, yeah.

11        Q.    Less than 15?

12        A.    I can't really say.  I'm not going to get

13   into that as far as an actual number.  Some of them were

14   repairs.  Sometimes we went to three places in one day.

15        Q.    So did you do repairs as well as --

16        A.    Anything.

17        Q.    Anything --

18        A.    Anything that he gave my foreman to go do,

19   that's what we did.

20        Q.    Is what you did.  When you went with a crew

21   to do -- to a job site, did you generally stay on that

22   job site until that project was completed?

23        A.    A lot of the times, yes.  But if it was,

24   like I said, repairs or minor things, we probably had

25   one here, one there, one there.
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          30

```
 1          Q.     And did occasionally you get pulled off of a
 2    crew to go to another crew for maybe a day or two --
 3          A.     Yeah.
 4          Q.     -- to help out?
 5          A.     Yeah, that type thing.
 6          Q.     Okay.  But generally speaking, you would
 7    stay on a job site until the job was completed?
 8          A.     Yes.
 9          Q.     How many people worked on your crew?
10          A.     You're saying with Joseph Thorne?
11          Q.     Yes.
12          A.     Okay.  Roughly about five.  Five to six at
13    most I think.
14          Q.     And who were those folks?
15          A.     Juan, Smiley, Felix, Joe, myself, Jorge for
16    the week or two he was there.
17          Q.     He only worked with you all a week or two?
18          A.     Yeah.
19          Q.     Anyone else?
20          A.     That's about it.  And whatever labor pool
21    guys they sent there.
22          Q.     All right.  How did you get to the job site
23    each day?
24          A.     I caught the bus to the shop and they drove
25    us to the site.
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          31

```
 1        Q.    Could you have driven to the job site in the

 2   morning with your own personal vehicle if you had wanted

 3   to?

 4        A.    I was never informed of that.

 5        Q.    Did anyone tell you you could not drive your

 6   own personal vehicle to the job site if you wanted to?

 7        A.    From what I was told is we supposed to be at

 8   the shop at six o'clock.

 9        Q.    Did you ever see anyone drive their own

10   personal vehicle to a job site that you were on?

11        A.    Maybe once or twice.

12        Q.    And who was that?

13        A.    And that was because of maybe they were

14   late, having court issues, or to see a probation

15   officer, something like that, you know.

16        Q.    And who was that?

17        A.    I know the first name, but I don't know the

18   last name, so Mike.

19        Q.    Mike?

20        A.    Yeah.

21        Q.    Was on your crew?

22        A.    Yeah.  Matter of fact -- yeah, that did

23   happen.

24        Q.    All right.  That's a name I didn't get

25   earlier.
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    32

```
 1        A.    He wasn't actually on our crew.  Like you
 2   said, when you had two crews go together, that type of
 3   thing happen.
 4        Q.    But he's the only person you ever saw drive
 5   a vehicle to a job site, a personal vehicle?
 6        A.    That I can think of right now, yeah.
 7        Q.    You never saw Felix Roman drive his own
 8   personal vehicle?
 9        A.    Maybe once.  Maybe once from a doctor's
10   appointment or when he had to go early or something like
11   that to a doctor or something, but never like.
12        Q.    Never like what?
13        A.    Every day, no.
14        Q.    And you can only think of one time that you
15   ever saw Felix Roman drive his own personal vehicle to a
16   job site?
17        A.    Once or twice.  Like I said, I'm not
18   watching Felix.  I know how I get there.
19        Q.    Well, you would know if he wasn't in the
20   company vehicle with you in the morning, would you not?
21        A.    He usually be there.
22        Q.    But if he wasn't, you would notice --
23        A.    But that doesn't mean he wasn't coming.
24        Q.    You need to let me finish my question and
25   I'll try to let you finish your answer.
```



Orange Legal
800-275-7991

1      A.    Okay.

2      Q.    So only one to two times during the time

3   that you worked with Mr. Roman did you see him drive his

4   own vehicle?

5      A.    A few.  A few.

6      Q.    A few?

7      A.    Yeah, meaning if he had a doctor appointment

8   like I told you, but most of the times he was at the

9   shop.

10      Q.    So he never drove for convenience purposes.

11   It was always he drove if he had something else he had

12   to do before he got to work, like a doctor's

13   appointment?

14      A.    That's all I knew.  I can't say.  It was the

15   foreman.  Him and the foreman would discuss what was

16   going on there.  I'm not a foreman.

17      Q.    Did you ever see Joe Thorne drive his own

18   personal vehicle to the job site?

19      A.    The whole time I was there, I think one time

20   I can actually say that happened.

21      Q.    So I apologize if I asked you this before

22   again, but did anyone ever tell you that you could not

23   drive your own personal vehicle to a job site?

24      A.    I never asked.

25      Q.    I'm not asking you --



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    34

```
 1        A.    I was told to be at the shop, okay, at six

 2   o'clock.

 3        Q.    And I'm not --

 4        A.    That's what I was told, to be at the shop at

 5   six o'clock.

 6        Q.    That's fine.  And that's not the question

 7   I'm asking you.  I'm --

 8        A.    And I just told you I don't remember and I

 9   don't have nobody telling me anything other than to be

10   at the shop.

11        Q.    Okay.  But my question was did anyone ever

12   tell you that you could not drive your own personal

13   vehicle to a job site?

14        A.    No.  I never asked.  Never heard.

15        Q.    I'm not asking if you asked them.  I'm

16   asking if anyone ever told you and said, no, you are not

17   allowed to drive your own personal vehicle, you need to

18   take company transportation?

19        A.    Nobody never told me nothing.

20        Q.    All right.  And who told you that you had to

21   be at the yard at six o'clock if you wanted to catch a

22   ride on the company transportation?

23        A.    Nobody never told me that.  They told me I

24   was supposed to be at the yard at six o'clock --

25        Q.    And who told you --
```



```
 1        A.    -- as report time.

 2        Q.    And who told you that?

 3        A.    Dennis.  Matter of fact, that was during the

 4   time I got hired, that was the time they expect to see

 5   us at the shop.

 6        Q.    So when you left your house in the morning,

 7   did you drive your personal vehicle to work?

 8        A.    I caught the bus.

 9        Q.    Is there any reason you didn't drive your

10   personal vehicle?

11        A.    I didn't have a license, nor did I have a

12   car.

13        Q.    And what part of town do you live in?

14        A.    Pine Hills.

15        Q.    Pine Hills?  And what bus did you take to

16   work in the morning?

17        A.    The 125, 11, a couple other buses go down

18   that way.  It all depends how I make the transition.

19        Q.    The 125 bus or the 11 bus?

20        A.    It was 18 or something like that.  I can't

21   remember.  It was three other buses.  If you don't make

22   the transition, you can catch either/or and it goes down

23   pretty much the same area.

24        Q.    What time did you leave your home?

25        A.    I got up about, I think, 4:15 was the
```



1  earliest bus, 4:20.

2      Q.    **You catch a bus at 4:15 or 4:20?**

3      A.    Well, I'm saying the bus be at its marker in

4  front of the house at probably about 4:15, 4:20.

5      Q.    **And is that the bus you took into work?**

6      A.    Yes.

7      Q.    **So did it take you from 4:15 or 4:20 to**

8  **around 6 to get in on the bus?**

9      A.    Yeah, because it goes downtown and I had to

10  wait on the other transition and then you have to make

11  it down there.

12      Q.    **So it's about an hour and 45 minutes to get**

13  **downtown?**

14      A.    Yeah, give or take.  Well, you're saying to

15  get downtown?

16      Q.    **I'm sorry.  To get to Hartford South.**

17      A.    Yeah.

18      Q.    **The bus drops you off at Hartford South?**

19      A.    Right probably about less than 100 feet from

20  there.

21      Q.    **Okay.**

22      A.    Corner store.

23      Q.    **About 100 feet from the yard?**

24      A.    Give or take.

25      Q.    **And you had to come downtown to the downtown**



1   station here and catch a --

2        A.    Yeah, and transfer.

3        Q.    And catch a transfer.  Did you ride the bus

4   every morning?

5        A.    Sometimes Joe would bring me.  He'd pick me

6   up on the way in.

7        Q.    And what time would Joe pick you up?

8        A.    Probably about 5, 4:30 or 5.

9        Q.    Well, it wouldn't take as long to get in

10  with Mr. Thorne driving as it would to do the bus,

11  correct?

12       A.    No.  No.

13       Q.    But he would still pick you up around 4:30

14  or 5?

15       A.    Somewhere around there.  Probably give or

16  take.

17       Q.    How often did you ride with Mr. Thorne?

18       A.    Probably about two, two and a half months,

19  three months maybe.

20       Q.    And is there any reason that you stopped

21  riding with Mr. Thorne?

22       A.    Yeah, I got laid off.

23       Q.    Okay.  So is it fair to say then that the

24  time you rode with Mr. Thorne would have been around the

25  last three months of your employment with Hartford



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 38 of 145 PageID 200

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    38

```
 1   South?

 2        A.    Somewhere in there, yeah.

 3        Q.    How did you come about getting a ride with

 4   Mr. Thorne in the morning?

 5        A.    I think one day he asked me where I stayed

 6   at and I told him.  And he was like he stay down the

 7   street from there.  And he was like I'll give you a

 8   ride.

 9              (Defendant's Exhibit No. 2 was marked for

10        identification.)

11   BY MR. BALL:

12        Q.    Let's look at what we'll mark as Defendant's

13   Exhibit 2.  Is this your application for employment that

14   you made to Hartford South?

15        A.    Mm-hmm.

16        Q.    You need to answer yes or no.

17        A.    Yes.  Yes.  My bad.

18        Q.    It's fine.  I understand.  Please look at

19   the last page and tell me if that's your signature on

20   the last page?

21        A.    Yes.

22        Q.    And the date of your signature is October 27

23   of 2014?

24        A.    Yes.

25        Q.    So is it fair to say then that you did not
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    39

```
 1   start working until the next day, October 28th?

 2        A.    I told you that.

 3        Q.    Is that correct?

 4        A.    Yeah.

 5        Q.    Okay.  And you were hired at $12 an hour?

 6        A.    Yeah, that's what we negotiated.

 7        Q.    Okay.  Want you to look at the first page of

 8   that.

 9        A.    Okay.  What exactly do you want me to pay

10   attention to?

11        Q.    I'll get to it in just a moment.  It asks

12   you for your Florida driver's license number.  Do you

13   see that?

14        A.    Yeah.

15        Q.    And you put in a driver's license number,

16   correct?

17        A.    Mm-hmm.

18        Q.    You need to answer yes or no.

19        A.    Yes.

20        Q.    And is that your Florida driver's license

21   number?

22        A.    Yes.

23        Q.    Okay.  And it says expiration date, 2016?

24        A.    Well, that was the Florida identification

25   card which carries the same driver's license number.
```



 1  First time you get convicted of a crime, you already

 2  have a prison number.

 3       Q.     Sorry, you need to explain that a little

 4  bit.

 5       A.     If I had a license before and I got an

 6  identification card, I would have the same number on the

 7  identification card that I have on my driver's license

 8  because you cannot have an ID and a driver's license.

 9       Q.     So are you saying that you did not have a

10  driver's license?

11       A.     But that was the same number.

12       Q.     But not a driver's license?

13       A.     Yes, it was an identification card.

14       Q.     So you were not authorized to drive?

15       A.     No.

16       Q.     Did you tell anyone at Hartford South that

17  you did not have a driver's license?

18       A.     Yes.

19       Q.     And who did you tell?

20       A.     I think Dennis knew that.

21       Q.     Did you tell Dennis?

22       A.     He had to know.  I gave him my ID card.  You

23  have to take your social security card and all that and

24  Xerox it, so they knew.

25       Q.     Well, let me show you -- we don't need to



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    41

```
 1   mark this.  Is that your identification card?

 2       A.     Yes, sir.

 3              MR. BALL:  Let's go ahead -- let's mark

 4       this.

 5              (Defendant's Exhibit No. 3 was marked for

 6       identification.)

 7   BY MR. BALL:

 8       Q.     Would you agree with me that that looks very

 9   similar to a driver's license?

10       A.     Mm-hmm.

11       Q.     Is that a yes?

12       A.     Yes.

13       Q.     So you did tell Dennis Lovett that you did

14   not have a driver's license, just an identification

15   card?

16       A.     He Xeroxed it.

17       Q.     That's not my question.

18       A.     He didn't ask me.  The title of the job

19   didn't ask him to ask me if I had a driver's license.

20   He had no reason to ask me that.

21       Q.     I'm not asking if he asked you.  I'm asking

22   if you told him --

23       A.     No.

24       Q.     -- if you did not have a driver's license?

25       A.     No.  I'm quite sure later we did.
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    42

```
 1        Q.     That you told him later?

 2        A.     I'm quite sure.  You would have to have a

 3   reason for catching the bus and stuff, right?

 4        Q.     On your application, though, it says Florida

 5   driver's license number.  You didn't scratch that out

 6   and put Florida ID number, did you?

 7        A.     I'm not a lawyer.  I didn't know I had to do

 8   that.  I just knew by the law that that is the same

 9   number, so I knew I'd get a driver citation if I was to

10   drive and they write a ticket using that number.

11        Q.     Can you get a driver's license?

12        A.     I have one now.

13        Q.     You have one now.  When did you get it?

14        A.     I can't remember.  Probably about ten -- I

15   can't remember.  I just got it back this year, sometime

16   this year.

17        Q.     So you got it sometime this year?

18        A.     Yes.

19        Q.     And had you ever had one before?

20        A.     Yeah.  That's how it got suspended.

21        Q.     So when's the last time you had a valid

22   driver's license before the one you got this year?

23        A.     Whoa.  Probably 2005.  I'm not sure.  It's

24   been over ten years.  About 2006 probably.

25        Q.     So would it be fair to say that if Hartford
```



Orange Legal
800-275-7991

1   South did not provide company transportation to the job

2   sites in the morning, that you would not have been able

3   to work for Hartford South?

4        A.    I wouldn't say that.

5        Q.    All right.  How would you have got to the

6   job sites then?

7        A.    Bus line.

8        Q.    Did you ever decide to take the bus line to

9   the job site?

10       A.    I wasn't aware I had to.  I was told to

11   report to the yard.

12       Q.    But you never -- you think that you could

13   have taken the bus to any job site?

14       A.    If you would have told me where I needed to

15   be.

16       Q.    So what if you were working in Tampa, you

17   would take the bus to Tampa?

18       A.    No.  I don't think I would have drove my car

19   for $12 to Tampa.

20       Q.    If you had to?

21       A.    Not for 12 bucks.  I think gas was very

22   expensive back in that time.

23       Q.    Gas was inexpensive --

24       A.    I said very expensive.

25       Q.    Let me finish my question, sir, please so



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 44 of 145 PageID 206

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                           44

 1    she's not taking us both down.  So is it your testimony

 2    gas was very inexpensive when you worked for Hartford

 3    South back in 2014 or 2015?

 4         A.    Opposite what you just said.  It was very

 5    expensive.

 6         Q.    What was your circumstances for leaving B&D?

 7         A.    Because I couldn't obtain a driver's license

 8    in a timely fashion, which they had me traveling all

 9    over the road.

10         Q.    How were you traveling with them without a

11    driver's license?

12         A.    I didn't need one.

13         Q.    Well, that's what I'm asking.  How were you

14    traveling with them?

15         A.    Oh, we had a -- an operator that drove the

16    truck.

17         Q.    To and from the job sites?

18         A.    Yeah.

19         Q.    Well, if the operator was driving the truck

20    to and from the job sites, why did you need a driver's

21    license then?

22         A.    Because he wanted me to have one because of

23    the policy of DOT.

24         Q.    What policy of DOT that --

25         A.    By me being there with him, if someone



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    45

1  needed to move one of the vehicles or something, they

2  needed that to be done.

3      **Q.    Well, there was more than just you and the**

4  **operator in the truck, was there?**

5      A.    No.

6      **Q.    Just the two of you?**

7      A.    Yeah.

8      **Q.    How long did you work with B&D?**

9      A.    I think for almost a year.

10     **Q.    So you rode with him for almost a year in**

11 **violation of the DOT?**

12     A.    No.  No.  No.  No.

13     **Q.    All right.  Then explain that to me, then.**

14 **Because you said that --**

15     A.    The company themselves decided that if a

16 person didn't have a license, then they wouldn't be much

17 good to the operator.

18     **Q.    After a year?**

19     A.    Yeah, but it was not for -- I could not

20 obtain a license because of the simple fact he had me

21 out of town.  And to get a lawyer, they wanted to speak

22 to me personally and constantly just moving crap, you

23 know.

24     **Q.    I'm not sure I understand.  You needed a**

25 **license to continue working with B&D.  Why didn't you**



1   just go get a license?

2        A.    I couldn't.  I didn't have the time to go

3   down there.  I had court issues and they were being held

4   up by other things as far as court costs, back due

5   bills, all sorts of crap.

6        Q.    So because you owed money, you wouldn't be

7   able to get a driver's license?

8        A.    Yeah.  Well, I had open cases too for

9   miscellaneous things.

10       Q.    What did the open cases have to do with you

11   getting a driver's license?

12       A.    Now your driver's license get suspended for

13   anything, anything criminal.  They gone.  Make a

14   payment, don't make a payment.

15       Q.    Well, that's suspended, but you didn't have

16   a license to suspend.

17       A.    Yeah.  It was suspended because of failure

18   to pay for obligations as far as court costs.

19       Q.    So you still had a driver's license when you

20   worked with B&D but it was just suspended?

21       A.    I wouldn't think so.  How would you suspend

22   it if it wasn't there?

23       Q.    Well, driver's licenses have an expiration

24   on them, right?

25       A.    Yeah.



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 47 of 145 PageID 209

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          47

1        Q.     When that expiration hits, the license is no

2    longer.   And you told me you haven't had a valid

3    driver's license since 2004, 2005.  So I'm trying to

4    figure out did you actually have a driver's license when

5    you were working with B&D?

6        A.     No.  That's what I told you.

7        Q.     So there was no license to be suspended?

8        A.     No.  They already suspend it since 2005.

9        Q.     Well, it would have expired at some point.

10       A.     Well, I didn't have them.  I had an ID.

11   They took the license itself once I gave it to the

12   officer.  He took it and put it in his top pocket and I

13   went to jail.

14       Q.     So you didn't have one with you?

15       A.     No, I had an ID.

16       Q.     Well, let me ask you this.  When you went to

17   get a driver's license this year, did you just reinstate

18   your license that you had had before?

19       A.     Yes.

20       Q.     They didn't give you a new driver's license?

21       A.     No, I wish they would.

22       Q.     So they let you go at B&D because you

23   couldn't obtain a license?

24       A.     Yes.

25       Q.     And who was the operator?  Was that Buddy?



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                48

```
 1        A.    No.  We had all kinds of operators.
 2        Q.    Who was Buddy?
 3        A.    Buddy was the -- he was more like dispatch.
 4        Q.    When you rode to and from the job site with
 5   the operator at B&D, they pay you for that time?
 6        A.    Yeah, you got paid travel time.
 7        Q.    How far were the job sites?
 8        A.    Some of them were right around the area.
 9   Some of them could range from Tampa to Georgia,
10   Chattanooga, Tennessee.
11        Q.    Let's talk about the ones that were in town.
12        A.    Yes.
13        Q.    You had job sites that were in town?
14        A.    Yeah.
15        Q.    And it's your testimony that they paid
16   you --
17        A.    Yes, sir.
18        Q.    -- for your -- let me finish my question,
19   sir, please.  It was your testimony they paid you for
20   your travel time in town?
21        A.    Yes.
22        Q.    Both to and from the job site?
23        A.    Yes, sir.
24        Q.    Take a look at page 3 of your employment
25   application.  And it says under section F, employment
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                        49

```
 1    history, previous employment, lists below your last four

 2    employers, the most recent one first.  Is B&D the only

 3    job that you had had since getting out of jail or

 4    prison?

 5         A.    No, but at the time that my license was

 6    suspended since 2005, that was the first person that

 7    gave me a shot and it was due to a friend.

 8         Q.    So that's the first job you had had since

 9    2005, the one with B&D?

10         A.    Yeah, it was a long time I wasn't employed.

11    Especially after Obama got elected, so didn't get much

12    work.

13         Q.    Who is Jeff Miller?

14         A.    My father.

15         Q.    And where is he located?

16         A.    Tampa.

17         Q.    And what is his address?

18         A.    I don't know the address.

19         Q.    What street does he live on?

20         A.    Stepping Stone.

21         Q.    I'm sorry?

22         A.    Stepping Stone.

23         Q.    Can you spell it?

24         A.    S-t-e-p-s-t-o-n-e.

25         Q.    Is it Stepin or Stepping Stone?
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                                50

```
 1        A.    Stepping Stone.  I'm not sure.
 2        Q.    Stepping Stone what?  Drive?  Avenue?
 3        A.    I don't know.  I haven't been there in a
 4   minute.
 5        Q.    I'm sorry?
 6        A.    That's all I know.
 7        Q.    And he lives in Tampa?
 8        A.    Yes.
 9        Q.    Is he still married to your mother?
10        A.    No, not at the moment.
11        Q.    I'm not sure what you mean not at the
12   moment?
13        A.    No.
14        Q.    We're going to be going through these for a
15   while.  Do we need to take a break at all before we do
16   this?
17        A.    No.  I'm ready.
18              (Defendant's Exhibit No. 4 was marked for
19        identification.)
20   BY MR. BALL:
21        Q.    Mr. Humphries, what I've given you we have
22   marked next as Defendant's 4 which is your payroll
23   records during the time that you worked for Hartford
24   South.  I want to give you a moment, if you haven't had
25   an opportunity already, to kind of go through that and
```

 1    look at those.

 2         A.     Okay.

 3         Q.     And I want to go through them one by one so

 4    if you'll go with me.  If you see on the left-hand side,

 5    there is something called check date.

 6         A.     Mm-hmm.

 7         Q.     Is that a yes?

 8         A.     Yes.

 9         Q.     Okay.  And I'm going to go down these with

10    you.  So let's look at check date 11/4/2014.  It appears

11    that you only worked four days that week; is that

12    correct?  Because you started, I believe, on a Tuesday.

13    October 28th was a Tuesday.  So you worked Tuesday

14    through Friday or four days that week; is that correct?

15         A.     Yes, probably.

16         Q.     And then the following week you worked 3, 4,

17    5, and 7 of November.  That's only 4 days, correct?

18         A.     Yes.

19         Q.     And the next week you worked five and you

20    were paid overtime of .75 hours or three quarters of an

21    hour.  Do you see that?

22         A.     Mm-hmm.

23         Q.     On 11/14?

24         A.     Yeah.

25         Q.     Do you see that?  Okay.  The next week you



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 52 of 145 PageID 214

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          52

1    worked five days and then the week of the 24th it

2    appears you only worked one day; is that correct?  Oh,

3    excuse me, for the check date 12/2/2014 that you only

4    worked one day?

5         A.    According to the paper, yes.

6         Q.    Yes.  Would you have any reason to believe

7    that this is not accurate?

8         A.    I wouldn't dispute you because I can't

9    remember.

10        Q.    Okay.  Look at check date 12/9/2014.  It

11   looks as though you only worked four days that week?

12        A.    12/9.

13        Q.    12/9/2014 check date.

14        A.    Okay.  I see it right here.

15        Q.    You worked December 1 through 4, four days

16   that week?

17        A.    Mm-hmm.

18        Q.    Is that yes?

19        A.    Yes.

20        Q.    And look down at 12/30/2014 check date.

21        A.    12/30.

22        Q.    And you worked three days that week,

23   September 22, 23, and 24?  Do you see that?

24        A.    Yes.

25        Q.    And then check date 1/6/2015 you only worked



```
 1   three days in that work week, December 29, 30, and 31.

 2   Do you see that?

 3        A.    Yes.

 4        Q.    And check date January 20, 2015 you only

 5   worked four days that week, the 12th, 13th, 14th, and

 6   15th, correct?

 7        A.    No.

 8        Q.    I'm sorry?

 9        A.    Now, this I can't really say like I was

10   saying because I did have times that we did go to other

11   crews and the other supervisor did not know your name,

12   you didn't get wrote down, so we had discrepancies about

13   that too.

14        Q.    Wait.  We're on -- we'll talk about that in

15   a minute.

16        A.    But you asked me about the hours.  That

17   would depend on the hours and if I didn't get wrote

18   down, I wouldn't get shown up for all this.

19        Q.    I'm going through the records with you.

20   Let's stick with the records.  11/20/2015 check date

21   says you worked four days that week, the 12th, 13th,

22   14th and 15th of January; is that correct?

23        A.    That's what it says, yeah.

24        Q.    Okay.  Go to the next page.  Check date

25   2/3/2015, you only worked four days during that week,
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    54

```
 1    January 27, 28, 29 and 30?

 2         A.    That's what it says.

 3         Q.    Okay.  The next week check date 2/10/2015,

 4    you only worked four that week, February 2, 3, 4, and 6.

 5    Is that what it says?

 6         A.    That's what it says.

 7         Q.    Check date 2/24/2015, four days that week,

 8    February 16, 17, 18, and 19.  Is that what it says?

 9         A.    Yeah.

10         Q.    Check date March 3, 2015, four days that

11    week, February 23rd, 24th, 25th, and 26th.  Is that what

12    it says?

13         A.    Okay.

14         Q.    Is that what it says?

15         A.    Yeah, that's what it says.

16         Q.    March 17, 2015, four days, March 9, 10, 11,

17    and 12.  Do you see that?

18         A.    Yep.

19         Q.    And it appears as though you were on a more

20    long distance job site that week because you were paid

21    for travel, the other pay.  Do you recognize what the

22    other pay is?

23         A.    It just says other pay, I guess.

24         Q.    Yeah.  And it's $20 a day?

25         A.    Mm-hmm.
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    55

```
 1          Q.    Was that for travel?

 2          A.    I'm assuming.  I don't know.  It don't say

 3    that.  I see the 20 bucks here at the end of it.

 4          Q.    All right.  Look at check date 3/24/2015.

 5    Looks as though you worked three days that week, the

 6    17th, the 19th, and the 20th.  Is that what it says?

 7          A.    Yeah.

 8          Q.    March 31, 2015 pay date -- check date,

 9    excuse me, it looks as though you worked three days,

10    March 25, 26, and 27?

11          A.    Okay.

12          Q.    Is that what it says?

13          A.    That's what it says.

14          Q.    Check date April 7, 2015 says you worked

15    four days that week, March 30, 31, and April 1 and 2.

16    Is that what it says?

17          A.    Yes.

18          Q.    Check date April 14, 2015, four days in that

19    week, April 6, 8, 9, and 10.  Do you see that?

20          A.    Yeah.

21          Q.    Check date, May 5 of 2015, only two days

22    that week, April 29 and April 30.  Do you see that?

23          A.    Yeah.

24          Q.    Okay.  Check date 5/19/2015, four days that

25    week, May 12, 13, 14, and 15?
```



1       A.    Yes.

2             Q.    Check date May 26th, 2015, three days in

3    that work week, May 18, 19, 20.  Do you see that?

4       A.    Yes.

5             Q.    Check date 6/2/2015, three days in that work

6    week, May 26, 28, and 29.  Do you see that?

7       A.    Yes.

8             Q.    The next paycheck 6/9/2015, four days in

9    that work week, June 1, 2, 4, and 5.  Do you see that?

10      A.    Yes.

11            Q.    Look at check date on the next page,

12   7/7/2015.  Only two days in that work week, June 29 and

13   July 1.  Do you see that?

14      A.    Mm-hmm.

15            Q.    Is that a yes?

16      A.    Yes.

17            Q.    Check date 7/21/2015, only four days in that

18   work week, July 13, 14, 16, and 17.  Do you see that?

19      A.    Yes.

20            Q.    Work week or check date 8/12/2015.  It looks

21   as though you were off that week.  Would that have been

22   vacation?

23      A.    I think we had some rain problems then.  It

24   was time when it rained like that.

25            Q.    Okay.  Check date 9/1/2015, or excuse me,



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES
57

1    check date August 25, 2015.  It looks as though you only

2    worked one day in that week -- no, no.  I take that

3    back.  Strike that.  September 1, 2015 check date, it

4    looks as though you worked four days in that week,

5    August 24, 26, 27 and 28.  Do you see that?

6         A.    Yeah.

7         Q.    Check date September 9, 2015 four days in

8    that work week, August 31, September 1, 2, and 4.  Do

9    you see that?

10        A.    Yes.

11        Q.    Check date 9/15/2015, only two days in that

12   work week, September 9 and September 10.  Do you see

13   that?

14        A.    Yes.

15        Q.    Check date 9/22/2015, three days in that

16   work week, September 14, 16, and if you'll look on the

17   next page 22, or excuse me, 18.

18        A.    Right.

19        Q.    All right.  Now, you said just a moment ago

20   that there were times when you went to work for crews

21   other than Joe Thorne's for a day or two days or however

22   long that it was and that -- is it your contention that

23   your super -- or your foreman did not write down your

24   time?

25        A.    Yeah.  If they didn't know your name, yeah,



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    58

```
 1  you wouldn't get recorded.
 2       Q.    Well, tell me any instance where you think
 3  that you worked for someone other than Joe Thorne and
 4  they didn't write down your time?
 5       A.    Several times.
 6       Q.    Okay.  Tell me those.
 7       A.    I can't tell you like you saying you want me
 8  to be accurate.  I can't do that right now.
 9       Q.    Well, who was the supervisor?
10       A.    Oh, I worked for Diego one time.
11       Q.    And he didn't write down your time?
12       A.    Oh, yeah.
13       Q.    Is that a yes?
14       A.    Yeah.
15       Q.    One time or more than one time?
16       A.    It's happened more than one time.  I worked
17  for Basso (ph).  Not Basso.  Whatever his name is.
18       Q.    Auto?
19       A.    Whatever his name.
20       Q.    I don't know what his name is.
21       A.    He didn't speak any English.  He didn't
22  remember my name neither.
23       Q.    Urbano?
24       A.    Yeah.
25       Q.    And is it your contention that Urbano did
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          59

```
 1  not write down your time?
 2       A.    Well, like I said, if they didn't know you
 3  and you weren't a part of their actual crew, they
 4  probably forgot to write it down because they don't know
 5  your name.
 6       Q.    Well, did anyone ever tell you, any of these
 7  supervisors or foremen other than Mr. Thorne, that they
 8  didn't write your time down?
 9       A.    Yeah, of course.  I went in and said
10  something about it.
11       Q.    No.  No.  Did any of the supervisors tell
12  you -- foremen, I'm sorry --
13       A.    Yeah, I had problems with my check and I
14  went and said something.  Did you say did they tell me
15  they didn't?
16       Q.    Yes.  Did any of them ever tell you I'm not
17  going to write down your time?
18       A.    No, they didn't say that.
19       Q.    Okay.  And if you had an issue that you
20  didn't think your time was correct, did you go in and
21  address it with payroll?
22       A.    Yeah, I called.
23       Q.    You called who?
24       A.    I talked to Dennis one time and he told me
25  he had to get with them to see what was going on.
```



**Orange Legal**
**800-275-7991**

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                           60

```
 1         Q.    So you got with Dennis?

 2         A.    Yeah, once or twice.  I even had to call Joe

 3    a couple times.

 4         Q.    And did it get corrected?

 5         A.    As far as to my knowledge, I think they did

 6    do something about it.

 7         Q.    So they did correct it?

 8         A.    Yeah.

 9         Q.    Is that a yes?

10         A.    Yes.

11         Q.    Okay.  So by my calculation there were 49

12    pay periods during the time that you were there.

13         A.    Mm-hmm.

14         Q.    And it appears from the records here that

15    there were only 18 weeks in which you worked five days

16    or more; is that correct?

17         A.    Mm-hmm.

18         Q.    Is that a yes?

19         A.    Yes.

20         Q.    Okay.  What time did you arrive at the yard

21    in the morning?

22         A.    Six.

23         Q.    What time did the bus get there?

24         A.    Probably I think the bus let us off probably

25    about like 5:45.
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                61

```
 1        Q.    And what did you do for those 15 minutes?
 2        A.    I might have went across the street to the
 3   store and grabbed me a soda, some cigarettes and walked
 4   back down there.
 5        Q.    Do you drink coffee?
 6        A.    No.
 7        Q.    And when you got to the yard then at 6 in
 8   the morning, what did you do?
 9        A.    Get the keys to the truck, whatever
10   materials we needed.
11        Q.    You got the keys to the truck?
12        A.    Yeah.
13        Q.    What did you do with the keys to the truck?
14        A.    Go and get the truck and pull it back there
15   so we can put the stuff on it.
16        Q.    You would drive the truck without a license?
17        A.    It was in the yard.  I don't need a license.
18        Q.    You don't need a license to drive in the
19   yard?
20        A.    It's private property.  It's his property.
21        Q.    So you took the truck around every morning?
22        A.    To back it out and pull it in front of the
23   garage so we can load the materials.
24        Q.    Was that every morning?
25        A.    Yes.
```



1      Q.     Was Joe there when you got there in the

2   mornings?

3      A.     Yeah.

4      Q.     Did Joe tell you to take -- go get the truck

5   in the morning and bring it around?

6      A.     Yeah, he would ask me to go grab the keys.

7   And when we started riding together, I just assumed that

8   was protocol.

9      Q.     So you drove the truck around to the

10  warehouse?

11     A.     No.  I backed it up there.  It wasn't that

12  far.

13     Q.     And what did you do then?

14     A.     Get water, ice and stuff, nails, glue,

15  plates, screws, board if we needed it.

16     Q.     I'm sorry?

17     A.     Board if we needed it.

18     Q.     Board?

19     A.     Yeah.  Or Styrofoam, whatever you call it.

20     Q.     Anything else?

21     A.     Anything we needed.  If we needed it, we

22  needed it.  Towels, rags.

23     Q.     What were the towels and rags used for?

24     A.     Oh, usually to clean up glue, wipe down

25  areas.



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    63

```
 1        Q.    Did Joe help in getting these things in the
 2   morning?
 3        A.    Yeah, he would if he was there or do the
 4   paperwork.  Either way.
 5        Q.    So he would help but not every day?
 6        A.    Yeah, he helped.
 7        Q.    He helped every day?
 8        A.    Yes.  If I'm not mistaken, the materials
 9   were on his sheet so he had to tell us what to go get.
10        Q.    Did anyone else help you in the mornings?
11        A.    Yeah, when Felix was there, yeah, he'd come.
12        Q.    When he was there?
13        A.    Yeah.
14        Q.    How often did Felix help?
15        A.    If he was there, he helped me or if he -- if
16   he did come, he'd come right on time so it probably
17   would have all been done.  It depends what it was.  But
18   if everyone was there, we all pitched in and got the
19   stuff.
20        Q.    Were there times that Felix didn't get there
21   until right before the transportation was ready to go?
22        A.    Yeah, sometimes.
23        Q.    Were there times that there would be people
24   on your crew that would be there early enough but they
25   didn't help for whatever reason, they smoked cigarettes
```

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          64

1   or drank coffee or just hung out and talked with other

2   employees?

3        A.   With our crew, mostly everybody showed up

4   about like -- probably about the time we getting ready

5   to pull out as far as the other three.

6        Q.   And that would have been 6:30 or 6:45?  What

7   time did you all leave?

8        A.   The shop?

9        Q.   Yes.

10       A.   Give or take.  It all depends.  Like you

11  said, it could have been about 6:30.  I don't remember.

12       Q.   Well, generally speaking.

13       A.   Yeah.

14       Q.   6:30?

15       A.   (Witness nods head).

16       Q.   So a lot of the crew didn't show up until

17  right at the time --

18       A.   Yes.

19       Q.   -- they were getting ready to go?  Would

20  Felix be part of that as well?

21       A.   Sometimes he did.

22       Q.   Okay.  And who are the other ones on your

23  crew that wouldn't show up until it was time for the

24  transportation to leave?

25       A.   Let me see.  I think Jorge came in right on



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          65

```
 1   time.
 2        Q.    Anyone else?
 3        A.    Everybody else usually be there.
 4        Q.    Usually did what?
 5        A.    Be there.
 6        Q.    Be there when, when it's ready to go?
 7        A.    Oh, be there, be already there.  Like six
 8   o'clock.
 9        Q.    Okay.  Did anyone, to your knowledge, ever
10   talk to Jorge or Felix about not showing up until it was
11   time for the transportation to leave?
12        A.    No.
13        Q.    So is it your testimony that you helped out,
14   on days you were at work, that you helped out Joe every
15   morning that you were at work to get the truck ready?
16        A.    Yes.
17        Q.    And that Felix did sometimes and others --
18   what about the others, other than Jorge who just showed
19   up to get on the transportation?
20        A.    Well, it fluctuated, meaning --
21        Q.    What do you mean it fluctuated?
22        A.    Because sometimes they would send him other
23   places, so I guess...
24        Q.    I mean, were there times that Smiley was
25   there that he didn't help out?
```

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    66

```
 1        A.    Yeah, sometimes.  It all depends.
 2        Q.    So sometimes he would help out, sometimes he
 3   wouldn't?
 4        A.    Yeah.
 5        Q.    Who else?
 6        A.    That would or wouldn't?
 7        Q.    Either.  That would help --
 8        A.    Because the only thing I knew was about my
 9   crew.  I didn't care about what other --
10        Q.    I'm talking about your crew.  People in your
11   crew.
12        A.    Sometimes.  I just took it as the
13   initiative, the first person that should be doing it.
14        Q.    Juan.  What about Juan?
15        A.    Yeah, he usually go get rags and stuff.
16        Q.    All the time or just sometimes?
17        A.    All depends.  I can't really make an
18   accurate account of all that.
19        Q.    Well, all I'm trying to determine, Mr.
20   Humphries, is did these people help out every single day
21   or once in a while they helped out?
22        A.    If they're on time, yeah, they helped.
23        Q.    And if they weren't --
24        A.    If they didn't, then it was already done
25   quite naturally.
```



**Orange Legal**
**800-275-7991**

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          67

```
 1        Q.    So it would be sometimes then?

 2        A.    Yes.

 3        Q.    Who drove the truck to the job sites?

 4        A.    Joe.

 5        Q.    Did he always drive?

 6        A.    Except for one time that he didn't come into

 7   the job.

 8        Q.    What was that?

 9        A.    I think he had some family issues that he

10   had to drive so Felix drove.

11        Q.    Okay.  But other than that one time, Joe

12   always drove?

13        A.    Yes.

14        Q.    How long would it take you to get the truck

15   ready in the morning?

16        A.    Give or take, probably about 15, sometimes

17   20 minutes.  It all depends on what materials because

18   some of that stuff was heavier or might have needed two

19   guys.  It all depends what it was.

20        Q.    Were there mornings that you didn't have to

21   get anything on the truck other than perhaps water?

22        A.    No.  That did happen every now and then, but

23   it was always times that we got there and we didn't have

24   enough screws, we didn't have enough plates, might not

25   have enough boards.  It all depends.  Something is
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    68

1  always going to be missing.  Not everything was always

2  there.

3       Q.   I'm presuming, and tell me if I'm wrong,

4  that when you would finish the job at the end of the day

5  and come back to the yard, you would know from leaving

6  the job site what was needed for the next day if you

7  needed more screws or this or that?

8       A.   For sure.  That's why this took place in the

9  morning.

10       Q.   Okay.  To your knowledge, was Joe

11  responsible for letting the yard dog know when he got

12  back what was needed for the next day?

13       A.   No.  I don't know about that because I was

14  not a supervisor.  I don't know what his job duties were

15  as far as that.

16       Q.   Okay.  That's fair enough.  Do you know what

17  a yard dog is?

18       A.   I'm assuming the guy he had running around

19  the forklift.

20       Q.   Did you ever come to work in the morning and

21  there were things already loaded onto your truck?

22       A.   Yeah, stuff like that had to be picked up by

23  the forklift, stuff like that, yeah, I'm quite sure.

24       Q.   Can you give me an idea of what had to be

25  put on the truck on a daily basis?



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 69 of 145 PageID 231

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    69

```
 1        A.    Oh, glue, rollers, towels, plates.

 2        Q.    What are plates?

 3        A.    Like little metal rings that hold down --

 4   oh, sometimes we get to certain jobs and it calls for

 5   different ply and we didn't have it, so we have to go

 6   get it from the guy, different texture the men bring as

 7   far as I've seen, tools.

 8        Q.    But now I'm asking on a daily basis, things

 9   that had to go on every day.  These are things that had

10   to go on every day?

11        A.    Yeah, towels, all of that stuff, yeah.

12        Q.    Glue, rollers, towels, plates.  Anything

13   else on a daily basis?

14        A.    Yeah.

15        Q.    What else?

16        A.    Some tools sometimes.  Depends on what kind

17   of things we run into up there.

18        Q.    Did you take your own tools?  Did you have

19   your own tools?

20        A.    Yeah, but then you also had things like

21   rollers.  All depends on, like I said, what type of

22   roof.

23        Q.    Did you leave things at the job site locked

24   up?

25        A.    I thought that's where it was supposed to
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                      70

```
 1  be.

 2       Q.    I'm talking about did you leave things at

 3  the job site?

 4       A.    Yeah.

 5       Q.    That were locked up?

 6       A.    Yeah.

 7       Q.    What kind of -- did you have glue and

 8  rollers and towels and plates that were at the job site?

 9       A.    Okay.  That work like you're saying on a

10  give and take day, especially when we start during the

11  wintertime, that stuff usually be wet and everywhere so

12  the glue stayed there.

13       Q.    At the job site?

14       A.    Yeah, glue.  Normally, like I said, it gets

15  used, everything.  It can be spilled.  Anything can

16  happen.

17       Q.    But you would keep glue at the job site?

18       A.    Yeah, once we transported it there.

19       Q.    Okay.  Would that come on the main

20  truck when the truck -- there's a main truck that goes

21  to the job site when the job first starts, correct?

22       A.    I'm not understanding, but the truck that we

23  ride in, that goes there.

24       Q.    Yeah, I understand.  But when you go to a

25  job site for the first time, let's say you've got to do
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                              71

```
 1   an industrial roof, is there a big truck from the plant
 2   or the yard that goes to deliver all the materials?
 3        A.    No.  The only thing I've seen come there was
 4   the crane.
 5        Q.    Is the crane on a truck or is the crane by
 6   itself?
 7        A.    The crane is a truck.
 8        Q.    Okay.  The crane is a truck.  So what does
 9   it bring?
10        A.    It brings the crane.  Sometimes it brings
11   some dig stick and a gang box which bring us to the
12   roof.
13        Q.    Does it bring the large supplies that would
14   be too big to carry in the truck?
15        A.    Yeah, that kind of thing like I was
16   explaining to you before.  The forklift, if they would
17   need the forklift, they would probably load it.
18        Q.    Okay.  So I've got on a daily basis glue,
19   rollers, towels, plates, and tools.
20        A.    Yes.
21        Q.    Anything else?
22        A.    That's about all I can think of off the top
23   of my head, yes.
24        Q.    And glue comes in what, containers?
25        A.    A tin bucket about the same size as your
```



```
 1    paint bucket.
 2          Q.    Okay.  And how many of those would you need
 3    to load in a given day?
 4          A.    About two -- two, three.
 5          Q.    How many rollers would you need to load on a
 6    daily basis?
 7          A.    Sometimes it was used, but I'd guess about
 8    three, maybe four.
 9          Q.    Towels?
10          A.    A bag of that shit.
11          Q.    A bag?
12          A.    Yeah.
13          Q.    Plates?
14          A.    Buckets.
15          Q.    How many buckets?
16          A.    Be one or two.  It all depends.  Nails come
17    in a bucket too.  Oh, and whatever you call the -- I
18    forget what they call it, the iron or whatever you call
19    that thing, crawler.
20          Q.    Iron?
21          A.    Crawler.
22          Q.    Crawler.  What's a crawler?
23          A.    It's an iron, a high tech iron.
24          Q.    What's it do?
25          A.    Seal the deck, whatever.
```



1        Q.     That's not something you would leave on the
2   job site?
3        A.     Yeah, you leave it there once it gets there.
4        Q.     Okay.  So the first time it goes out, but
5   then it stays there?
6        A.     Yeah.
7        Q.     It's not something you take on a daily basis
8   back and forth?
9        A.     No.
10        Q.     All right.  Again, I'm just looking for
11   things that are on a daily basis.  And so there would be
12   you and Joe in the morning loading this and sometimes
13   someone else, maybe one, maybe two other people?
14        A.     Yeah.
15        Q.     To get two or three glues, two or three
16   rollers, a bag of towels, and one or two buckets of
17   plates or nails and that would take 15 to 20 minutes?
18        A.     Give or take because, like you said, you got
19   all of those trucks trying to leave out at one time.
20   You don't have -- you got 48 trucks there.  Not saying
21   all of them move, but you got, what do you call it, a
22   production line going.
23        Q.     Right.
24        A.     Everything is lined up.  Everybody need the
25   same thing you need.



```
 1        Q.    And so --

 2        A.    So that's time consuming as well.

 3        Q.    Could they load more than one truck at a

 4   time?

 5        A.    If all of the workers are working, yeah.

 6        Q.    But I mean in the morning, how many could

 7   line up to get --

 8        A.    Oh, you -- boy, you have a lot of trucks.

 9   You have three or four of them out there.

10        Q.    That's what I'm trying to figure out.  How

11   many trucks go out in the morning, roughly?

12        A.    I can't tell you that.

13        Q.    Well, ten, 20, 100?

14        A.    Oh, boy.

15        Q.    Just a guess.

16        A.    Okay.  I would say about 20.

17        Q.    Okay.  Could all of the trucks that were

18   going out in the morning line up at the warehouse and

19   load at the same time or could you only load four at a

20   time, then they had to move, four more?

21        A.    Probably about four.  Three or four at a

22   time.

23        Q.    Okay.  So once you got to your position,

24   whether you were the first in line or whether you were

25   at the middle or end of the line, when you finally got
```



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 75 of 145 PageID 237

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                      75

1    your truck up there, how long then would it take to get

2    these things and load them into the truck?

3          A.    I guess probably about 10 or 15 minutes.

4    Then you got to go get water.

5          Q.    You've got three people doing this or two

6    people?

7          A.    Give or take.

8          Q.    Give or take.  And it would still take 15

9    minutes just to get that on the truck?

10         A.    Yeah.

11         Q.    Okay.

12         A.    You're looking at weight.  Like I say, when

13   you go to manual labor, if you are not a person that's

14   done manual things, you don't know what it is to carry

15   75 pounds, 50 pounds from here to the parking lot.  I

16   don't think you would be running with that.

17         Q.    But, I mean, in the morning you're not --

18   are you carrying it that far to load it in the truck

19   when the truck's up next to the warehouse?

20         A.    You don't back the truck up to everywhere if

21   you got a clutter of things.  You can't get to where you

22   want to be.  You got to take the position you can get.

23         Q.    But the stuff you have -- oh, so you're

24   saying that you don't wait your turn to get up by the

25   warehouse.  If you get up by the warehouse, great, all



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    76

1   well and good; but if you don't, then you got to carry

2   the stuff out to wherever the truck is?

3        A.    Yes.

4        Q.    How far is the furthest the truck is from

5   the warehouse?

6        A.    It could be, give or take, 50 feet, 25 feet.

7   It can be anywhere.  You gotta --

8        Q.    Okay.

9        A.    -- traffic jam.

10       Q.    But it's not a football field?

11       A.    No.

12       Q.    All right.  And it's your testimony, so

13  we're clear, that glue rollers, towels, plates, and

14  tools went on the truck every morning?

15       A.    Yes.

16       Q.    Done every morning by you, every morning by

17  Joe, occasionally by Felix?

18       A.    Water and all that.

19       Q.    All right.  Was there ever any mornings that

20  you didn't help out when you were there and just simply

21  sat around, had a coke, had a smoke and didn't help out?

22       A.    Sometimes probably was everything was there

23  and occasionally I got -- like you saying repairs, we

24  just don't, you know...

25       Q.    What about repairs?



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    77

1        A.     Repairs like you was saying, you probably

2   need probably a jug of lacquer and probably some rubber.

3        **Q.     So just less?**

4        A.     Yeah, sometimes it's less.   Sometimes it's

5   more.

6        **Q.     So there were sometimes that you did not --**

7   **you might have been there but did not help out at all?**

8        A.     I always was there first, so I always took

9   it, like I said, the initiative to fill up the water

10  jugs, put that on there.   Start wrapping the rags,

11  everything.

12       **Q.     Okay.   And you say the trucks generally left**

13  **around 6:30?**

14       A.     You can say that, I guess.

15       **Q.     Well, I'm asking you.   I don't know.   Is it**

16  **around 6:30?**

17       A.     Yeah, you can say that.

18       **Q.     All right.   Most of -- and I gather then it**

19  **depends on where the job site was is however long it**

20  **took you to get there and traffic, correct?**

21       A.     Yeah.

22       **Q.     Sometimes longer, sometimes shorter, depends**

23  **on where the job site is?**

24       A.     Yeah.

25       **Q.     You worked at Universal?**



Orange Legal
800-275-7991

1      A.    I think that was the last job site before I

2  got laid off.

3      Q.    **How long did it take to get down to**

4  **Universal in the mornings?**

5      A.    Oh, 6:30, you can probably get there in, I

6  guess, about 30 minutes.  Probably about 25 minutes,

7  somewhere up in there.

8      Q.    **Once you got to the job sites, tell me what**

9  **would happen then.**

10     A.    You take all of your tools to the roof,

11 start performing your duties, open the gang box.

12     Q.    **Open the what box?**

13     A.    The gang box.

14     Q.    **What's the gang box?**

15     A.    It's where your tools and all of the storage

16 equipment that you left on the site there.

17     Q.    **Got you.  Now, did you, as a helper, did you**

18 **work on the roof?**

19     A.    Yes.

20     Q.    **Okay.  So did all of the crew work on the**

21 **roof?**

22     A.    Yes.

23     Q.    **So there weren't lots of people doing stuff**

24 **on the ground?**

25     A.    You said there were lots of people doing



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          79

```
 1   stuff --
 2        Q.    No.  I said so there weren't lots of people
 3   doing stuff on the ground.  Everyone was on the roof?
 4        A.    Yeah.  Unless you was taking things off or
 5   something like that.
 6        Q.    Right.  Right.  Now, to your knowledge, were
 7   you paid from the time you got to the job site until the
 8   time you left the job site?
 9        A.    Okay.  From what I was told, we get paid
10   from the time we get on the roof until the time we get
11   off the roof.
12        Q.    And who told you that?
13        A.    I was told that by -- what is his name?
14   Justin?  I was told that by, what is his name, Dennis.
15        Q.    Anyone else?
16        A.    That's who told me.
17        Q.    No.  I said anyone else?
18        A.    No.
19        Q.    On the way to the job sites in the morning,
20   what did you do in the truck other than sit and ride?
21        A.    Oh.  What else could you do?
22        Q.    Okay.
23        A.    We were elbow to elbow with other people.
24        Q.    So you just basically sat and rode to the
25   job site?
```



```
 1        A.    Yeah.

 2        Q.    And that would be the same on the way home

 3  as well?

 4        A.    Yes.

 5        Q.    Now, when you got back to the job site,

 6  excuse me, or the yard in the afternoon, what did you do

 7  once you got back to the yard?

 8        A.    I guess the guy that was there park the

 9  truck.  He goes and fills out the paperwork.

10        Q.    That's what he does.  What do you do?  Do

11  you do any work once you get back or you just get on the

12  bus and go home?

13        A.    Yeah, I go.

14        Q.    You get on the bus and go home?

15        A.    (Witness nods head).

16        Q.    Is that a yes?

17        A.    Yes.

18        Q.    And what bus did you catch on the way home?

19  What time was that bus?

20        A.    It varies because, like I said, you have

21  about three different buses going up that way.

22  Sometimes they run every hour.  Sometimes it run every

23  30 minutes.  Whichever one gets you downtown quickest.

24        Q.    So would it be fair to say that when you got

25  back to the yard each day the time wasn't always the
```



```
 1  same, it could be a little later, a little earlier?

 2       A.    It's always going to be later, later than

 3  3:30.

 4       Q.    Later than 3:30?

 5       A.    For sure.  Traffic.

 6       Q.    What time would you quit work on the job

 7  site?

 8       A.    I think we quit probably about like 3:15.

 9       Q.    And that was customary on a regular basis,

10  you would quit by 3:15?

11       A.    Yeah, unless it rained.

12       Q.    Right.  And what time would you -- well,

13  strike that.  Because it would be when you got to the

14  job site in the morning it would depend on how far the

15  job site was, correct?  So getting to the job site in

16  the morning, that time would vary; but when you left the

17  job site or got off the roof in the afternoon, that time

18  was fairly fixed at 3:15?

19       A.    Well, we start cleaning up about 3:15, 3:00,

20  3:15.  It all depends how big of a mess we let get out

21  there.

22       Q.    Is there a set time that you would leave the

23  job site?

24       A.    Yeah, 3:30.

25       Q.    3:30.
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    82

```
 1        A.    Get off the roof at 3:30, supposedly.  There
 2   was no overtime or whatever.
 3        Q.    So about 3:30 you're in the truck going
 4   back?
 5        A.    Give or take.
 6        Q.    All right.  Without any unusual
 7   circumstances like weather, what have you, that's the
 8   general rule?
 9        A.    (Witness nods head).
10        Q.    Is that a yes?
11        A.    Yes.
12        Q.    Could you have caught a bus from the job
13   site back to your house as opposed to going back to the
14   yard and catching the bus?
15        A.    Sometimes it probably would have been
16   possible.
17        Q.    Did you ever do that?
18        A.    No.
19        Q.    Did anyone ever tell you that you couldn't
20   ride a bus from the job site back to your house if you
21   wanted to?
22        A.    That was in the same question you asked me
23   the first time.  Nobody ever told me that you could
24   drive your own car.  Nobody ever put emphasis on it.
25   They just said be at the yard.
```



1      Q.    And I'm not asking you about in the

2  mornings.   I'm asking you about in the afternoons.   Did

3  anyone tell you that you could not --

4      A.    No.

5      Q.    -- take a bus --

6      A.    I never asked.

7      Q.    Let me finish my question, sir.   Did anyone

8  ever tell you that you could not take a bus from the job

9  site at the end of the day back to your house?

10     A.    No.  I never was asked.

11     Q.    Did anyone ever discuss with you your

12 performance as a helper?

13     A.    No.  No.

14     Q.    Not Joe Thorne?

15     A.    No.

16     Q.    Did anyone ever talk to you about missing

17 work?

18     A.    No.

19     Q.    At any time?

20     A.    No.

21     Q.    Who told you that your employment with

22 Hartford South was going to end?

23     A.    Matter of fact, I think it was -- I didn't

24 talk to nobody, but I was told through Joe so...

25     Q.    So it was Joe that told you?



1       A.      Yeah.

2       **Q.      And tell me about that day.**

3       A.      Okay.

4       **Q.      What job site were you working on that day?**

5       A.      I think we were working at Disney, somewhere

6  by Disney or something like that.

7       **Q.      Okay.  Tell me what happened that day.  Tell**

8  **me -- anything unusual before you --**

9       A.      No.  The only thing I know is he told Felix

10  that don't come in anymore or something like that.

11  Something similar to that.

12       **Q.      Well, I'm asking you about you first.  So**

13  **when did -- when were you told that your employment was**

14  **going to end? Was it in the morning? At the end of the**

15  **day?**

16       A.      At the end of the day.

17       **Q.      And it was Joe that told you?**

18       A.      Yeah.  He didn't really say but...

19       **Q.      I'm sorry?**

20       A.      He didn't really say, but I think he told me

21  something.

22       **Q.      Well, what did he tell you?**

23       A.      He told me that -- what he told us that --

24  in front of Felix that they were going to let him go.

25       **Q.      He told Felix in front of you that Felix was**



```
 1   going to be let go?

 2        A.    Yeah.

 3        Q.    So explain how that happened.  Were you and

 4   Felix and Joe standing together?

 5        A.    Yeah.  Basically after we had left the truck

 6   and the guy got there, we were standing there waiting

 7   for him to come back out.

 8        Q.    Waiting for Joe to come back out?

 9        A.    Yeah.

10        Q.    And you and Felix were standing there?

11        A.    Yeah.

12        Q.    And what happened then?

13        A.    And we started walking to the parking lot

14   and he told him something to the effect of what I just

15   told you.

16        Q.    He told Felix what?

17        A.    That they were going to let him go.

18        Q.    Okay.

19        A.    And then he told me he didn't know about me

20   but he would call me and let me know.  So I was like,

21   okay.

22        Q.    And did Felix ask why?

23        A.    I think he did say something like that.

24        Q.    And what was Joe's response?

25        A.    I think I kept walking because after he told
```



1   me -- he didn't know about me.  Had nothing to do with

2   me.

3        Q.    But he said he would call you?

4        A.    Yeah.  Because matter of fact, that day I

5   rode with him and that's when he told me that.

6        Q.    So you rode with Joe -- you rode home with

7   Joe that day?

8        A.    Yeah.

9        Q.    And did you all talk about it on the way

10  home?

11       A.    He really didn't say.  He said that it

12  was -- they were laying people off.  He said they

13  probably going to get slow or whatever, and I'm not sure

14  what was going on, but somehow he knew.

15       Q.    But Joe's the only one you heard it from?

16       A.    Yeah.

17       Q.    And did Joe subsequently get with you and

18  tell you that in fact you were being laid off?

19       A.    He waited until he got to my house and he

20  picked up the phone -- he got the phone call back and he

21  asked and I think that's what Dennis told him.

22       Q.    Okay.  So the time you got to -- was this at

23  your house?

24       A.    Yeah.

25       Q.    Okay.  So Joe drives you to your house.



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    87

1       A.      Well, he drops me off in front, but this day

2    he took me into the house.

3       Q.      Okay.  He usually dropped you where?

4       A.      Like in the main road.  He don't come off

5    the main road.  He just drops me off and I take off.

6       Q.      And you walk the rest of the way?

7       A.      For sure.

8       Q.      But that day he took you to your house?

9       A.      Yeah.

10      Q.      And he made a call when you were both still

11   in the car?

12      A.      Yeah.

13      Q.      To Dennis Lovett?

14      A.      Yes.

15      Q.      And Dennis Lovett told him that you were in

16   fact being laid off?

17      A.      Yeah.

18      Q.      And then Joe relayed that information to

19   you?

20      A.      Yeah.

21      Q.      Okay.  Did you ask Joe why?

22      A.      Well, at the point right then it didn't

23   really matter.  My next move was what mattered, make

24   sure my money don't stop.  So I...

25      Q.      But at that time you did not ask Joe Thorne



**Orange Legal**
**800-275-7991**

```
 1    why you were being laid off?

 2         A.    No.  I think I did call back and I spoke to

 3    Dennis and I asked to speak to Pete.

 4         Q.    Pete?

 5         A.    Yeah.

 6         Q.    Who's Pete?

 7         A.    (Witness points).

 8         Q.    Okay.  Did you in fact talk with Dennis?

 9         A.    Yeah, I talked with him for a brief second.

10         Q.    And that was that same day?

11         A.    Yeah.  No.  No.  It wasn't the same day.  I

12    think it was the next day I waited.

13         Q.    Did you talk with anyone else that day?

14         A.    No.

15         Q.    Now, when Joe told Felix Roman in front of

16    you that Felix was being laid off, to your knowledge,

17    was that the first time Felix was aware of the fact that

18    he was being laid off?

19         A.    I can't -- yeah, to my knowledge.

20         Q.    Did Felix look surprised?

21         A.    I don't think none of us did.  I don't know.

22    I mean, as far as me and him, I don't think so.

23         Q.    It didn't surprise you that you were being

24    laid off?

25         A.    It's a layoff.  Things were getting slow.
```



 1   It was raining more.

 2       **Q.    So things had gotten slower?**

 3       A.    From what they were telling us, yes.  By me

 4   being not into it as long as Felix was, we were sharing

 5   job sites and I guess work was slow.

 6       **Q.    Did you have any conversations with Felix**

 7   **that day once Joe told him that he, Felix, was being**

 8   **laid off?  Did you have any discussions with Felix**

 9   **before you left that day?**

10       A.    No.  He immediately took off, Felix.

11       **Q.    And Felix didn't say anything to Joe?**

12       A.    They walked off.  You know what I'm saying,

13   I kept walking.  I heard what he told him and he told

14   him they were laying him off or firing him or whatever,

15   whatever the situation.

16       **Q.    Well, did he say layoff or fired?**

17       A.    Both of them the same to me.

18       **Q.    What was the term that Dennis Lovett used?**

19       A.    Dennis didn't tell nothing --

20       **Q.    Sorry.  What was the term Joe Thorne used**

21   **when he told Felix?**

22       A.    I think he was saying let him go.  When you

23   say let go, like you said, that's a big wide range of

24   stuff.

25       **Q.    Exactly.  So he just said let him go,**



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 90 of 145 PageID 252

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                        90

 1    correct?

 2         A.    He said you're being let go.

 3         Q.    Okay.  So you say you called Dennis Lovett

 4    the next day.  Tell me about that telephone

 5    conversation.

 6         A.    Okay.  If I'm not mistaken, I asked him -- I

 7    forgot what I asked him.  I can't even remember.  I

 8    asked to speak to Pete and I spoke to Pete.

 9         Q.    Okay.  But did you -- other than asking to

10    speak with Peter Rintelmann, did you talk with Dennis at

11    all about your layoff?

12         A.    Yeah, I asked him what was going on and why

13    was it?  And he was saying things were slow, but like I

14    said, it was a bunch of haywire stuff right there.

15         Q.    Well, besides saying things were slow, did

16    he say anything else?

17         A.    I can't really remember.

18         Q.    Okay.  Did he tell you that it had to do at

19    all with any work you were missing?

20         A.    No.  See, we never had problems with that

21    because I think we all knew that we had court issues,

22    that I had court issues as far as I was trying to get my

23    license back and it was going back and forth, back and

24    forth, back and forth.

25         Q.    Is that the reason that you had a lot of



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                      91

```
 1   three- and four-day work weeks because of court?

 2        A.    Yes, because I had to go down there because

 3   if not, they did issue a warrant every 30 days if you

 4   don't make a payment, so you either go to collections

 5   court or...

 6        Q.    Did you ever miss work to do another job

 7   like tree trimming or yard work?  Ever miss work to do a

 8   job for someone else?

 9        A.    Have I ever did it?

10        Q.    Yes.

11        A.    Yeah, I've done it.

12        Q.    While you worked for Hartford South?

13        A.    Yeah.

14        Q.    All right.  How many times?

15        A.    Once.

16        Q.    Pardon me?

17        A.    Once.

18        Q.    Any more than once?

19        A.    One time.

20        Q.    Could it have been more than one time?

21        A.    Nope.

22        Q.    Okay.  When was that?

23        A.    I had a tree job for somebody that worked at

24   Hartford South.  I can't remember which one now, but

25   they had a tree they wanted removed from the front of
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                        92

```
 1  the house.  I went and did it.

 2      Q.   Was this Felix or a relative of Felix's?

 3      A.   I'm not quite sure.  I did it for somebody

 4  at Hartford South.  I wasn't doing it for Felix or

 5  matter of fact, if I'm not mistaken, I think I did it

 6  for Juan.

 7      Q.   So in this telephone conversation you had

 8  the day after you were let go by Hartford South with

 9  Dennis Lovett, the only thing that you can recall in

10  asking Mr. Lovett why you were laid off is that Mr.

11  Lovett saying that things were slow.  That's the only

12  thing that you can recall?

13      A.   That's what he told me.  Now, what he wrote

14  down and what he told me may be totally different.

15      Q.   But you don't recall having any other

16  conversation with him --

17      A.   Dennis.

18      Q.   -- other than that?

19      A.   As far as being laid off?  No.  I called him

20  back.

21      Q.   And you don't recall any other substance of

22  the conversation other than what we just talked about?

23      A.   Like I said, it's been almost a year.

24      Q.   I'm just asking.

25      A.   Roughly I just know I did call him.  I
```



```
 1   remember calling him.  I do remember asking to speak to
 2   him after I spoke to Dennis.
 3        Q.    And you've told me everything that you can
 4   recall about that telephone conversation with Dennis?
 5        A.    (Witness nods head).
 6        Q.    Yes?
 7        A.    Yes.
 8        Q.    And I'm assuming at the end of that you
 9   asked to speak with Peter Rintelmann?
10        A.    Yes.
11        Q.    And did he transfer you to Mr. Rintelmann?
12        A.    Yeah, or he gave him the phone.
13        Q.    And tell me about your conversation with
14   Peter Rintelmann.
15        A.    I had asked him about vacation pay and he
16   said he was going to check and get back with me.  And he
17   said keep in touch to see if there was work over there.
18        Q.    Did you talk at all with Peter Rintelmann
19   about why you were laid off?
20        A.    I think Dennis had pretty much covered that
21   basis to the point of probably --
22        Q.    So you did not discuss with Peter Rintelmann
23   about why you were laid off?
24        A.    No, I don't remember doing that part.
25        Q.    Okay.  So other than asking about your
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                                 94

 1    vacation pay with Peter Rintelmann, anything else that
 2    you talked with him about?
 3         A.    He just told me to keep in touch.  If there
 4    was work, he would let me know.
 5         Q.    Did you talk with anyone else in management
 6    at Hartford South about your layoff other than Dennis
 7    Lovett and Peter Rintelmann?
 8         A.    Never questioned them.
 9         Q.    I guess I want to make sure you understand
10    my question.  Did you talk with anyone else other than
11    Dennis Lovett and Peter Rintelmann about your layoff?
12         A.    No.
13         Q.    Okay.  Thank you.  When's the first time you
14    contacted an attorney about your layoff?
15         A.    I think probably about like three weeks
16    later, two, three weeks later.  I can't recall.
17         Q.    And that would be this young lady sitting
18    beside you?
19         A.    I can't say I spoke to her, but I did speak
20    to somebody.
21         Q.    At Morgan & Morgan?
22         A.    Yes.
23         Q.    Let's go back to Mr. Thorne for a minute.
24    After Mr. Thorne drove you to your house on your last
25    day of employment, contacted Mr. Lovett, and Mr. Lovett



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    95

```
 1   confirmed for him that you were being laid off and Mr.

 2   Thorne let you know that, did you have any other

 3   conversation with Mr. Thorne that day?

 4        A.    No, not besides having a beer or so.

 5        Q.    You all went and had a beer?

 6        A.    No.  I had beer at the house and we drank a

 7   beer when he told me this.

 8        Q.    Okay.  So he didn't just drop you off and

 9   let you know that.  He came inside and had the beer?

10        A.    Yeah, he called back and ask Dennis.

11   Remember I told you that?

12        Q.    Yeah.  But I thought you all were sitting in

13   the car when that happened.

14        A.    We were riding in the car.  We were in my

15   driveway.

16        Q.    So after that call, you all got out and went

17   inside and had a beer?

18        A.    My garage was right out in front.  We sat

19   there and had a beer and he told me that Dennis told him

20   don't worry about coming in tomorrow.

21        Q.    Okay.  Did you all talk anymore about why

22   that occurred?

23        A.    I was already being told that they were

24   getting slow.  That's what I was already being told from

25   weeks before, so I really didn't think of it like that.
```



1        Q.    But my question is did you all -- outside --

2   after he told you that Mr. Lovett, Dennis Lovett had

3   said that you all were being laid off, did you have any

4   further discussion about that in the garage?

5        A.    No.  Not really.

6        Q.    Did you all have any discussions about

7   Hartford South in general?

8        A.    No.

9        Q.    Did Mr. Thorne have anything negative to say

10  about Hartford South?

11       A.    No, but we were talking about as far as

12  Felix go, but that was something totally different which

13  is totally away from here, but it wasn't about Hartford

14  South.

15       Q.    And what did you all discuss about Felix?

16       A.    Some health problems and the IRS.

17       Q.    Anything else other than Felix's health

18  problems and his issues with the IRS?

19       A.    No.

20       Q.    What kind of health problems did Felix have?

21       A.    Is that something that --

22       Q.    I'm sorry?

23       A.    Trying to figure out how is that helping

24  this?

25       Q.    What kind of health problems did Felix have?



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    97

```
 1        A.    He was sick.  What kind, we don't know.  He

 2   was going to the doctor so we didn't know what was

 3   really wrong with him.  He didn't know.  That's why he

 4   was going.

 5        Q.    Okay.  How long did Mr. Thorne stay at your

 6   house that day?

 7        A.    Probably long enough to finish the beer,

 8   which was probably a good 10, 15 minutes.

 9        Q.    And after that day, have you had any further

10   contact with Joe Thorne?

11        A.    He came by once or twice a couple of times.

12        Q.    So after September of 2000 -- September 18

13   of 2015, Mr. Thorne's come by your house a couple of

14   times?

15        A.    Yeah.

16        Q.    Did you discuss your layoff with him during

17   either of those times?

18        A.    No.  No.  He already knew -- he already knew

19   I wasn't going to work.

20        Q.    But did you discuss your layoff?

21        A.    No.

22        Q.    Did you discuss your lawsuit with him or

23   that you were thinking about filing a lawsuit?

24        A.    Not exactly.

25        Q.    What's not exactly mean?
```



```
 1          A.    Not exactly.  Meaning --

 2          Q.    What do you mean not exactly?  Did you or

 3    didn't you?

 4          A.    No, I didn't tell him nothing as far as that

 5    go.

 6          Q.    Did he ask you about a lawsuit?

 7          A.    He asked me about something as far as if was

 8    I still working for Felix.  And then he told me that

 9    they had let him go.

10          Q.    Did he say why?

11          A.    No, he didn't say that.  He just told me he

12    don't have a company phone anymore and they fired him as

13    well.

14          Q.    That they did or did not?

15          A.    They did.

16          Q.    They did fire him?

17          A.    He said I was laid off, he was fired.

18          Q.    Did you ask him why he was fired?

19          A.    No.

20          Q.    Did he tell you why he was fired?

21          A.    He really didn't really get into all of it,

22    no.  I was thinking it was because of something he had

23    done anyways.

24          Q.    But he didn't say what?

25          A.    He didn't.  He just said he was fired.
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    99

```
 1        Q.    Did you later find out why he was fired?

 2        A.    No.  That never actually researched.

 3        Q.    And nobody ever told you, whether it be him

 4   or someone else, why he was fired?

 5        A.    No.  Only person I had contact with that

 6   worked there was Felix.

 7        Q.    Okay.  And I believe you said, if I heard

 8   you correctly just a minute ago, when he came by these

 9   couple of times that you all talked about, he asked you

10   were you still working for Felix?

11        A.    Mm-hmm.

12        Q.    Is that a yes?

13        A.    Yes.

14        Q.    Okay.  Did you go to work for Felix after

15   you left Hartford South?

16        A.    No.  He was asking me was I still working

17   with Felix, meaning like helping him out because he was

18   sick and he had needed some trees removed.  And matter

19   of fact, I laid some grass for him one weekend.

20        Q.    So these were odd jobs that you were doing

21   for Felix?

22        A.    Yeah.  Well, basically how the whole

23   conversation was he wanted to know how I was getting

24   money.

25        Q.    I'm sorry?
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    100

 1       A.    Basically the whole conversation came up

 2  because he wanted to know how was I getting money.

 3       Q.    And what was your response to him?

 4       A.    Same thing I told you earlier.

 5       Q.    Which is what?

 6       A.    Family, people I know that had their own

 7  business and stuff, odds and ends.

 8       Q.    Did you apply for unemployment?

 9       A.    Yeah, I did.

10       Q.    Did you get unemployment?

11       A.    Yes.

12       Q.    So outside of those one or two times that

13  Joe Thorne has come by your house since you left

14  Hartford South, have you had any other contact with Joe

15  Thorne either by telephone or e-mail or text?

16       A.    Matter of fact, let me see, I think he did

17  call me one time and he came by.  So that would be about

18  three times he came by asking me to help him move some

19  furniture from his house.

20       Q.    Did you ever tell Joe Thorne that you were

21  thinking about or that you had filed a lawsuit against

22  Hartford South?

23       A.    No.

24       Q.    So to your knowledge, Joe Thorne would have

25  no knowledge of you and this lawsuit?



Orange Legal
800-275-7991

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    101

```
 1        A.     Yeah, he would have knowledge because he
 2   talked to Felix.
 3        Q.     Have you talked with anyone else besides --
 4   well, let's leave Felix Roman aside for a moment.  Have
 5   you talked with anyone else who is or was an employee at
 6   Hartford South about your lawsuit?
 7        A.     Only people I have contact with, like I told
 8   you, on the main stream was Joe and Felix.
 9        Q.     But Joe you said you never talked about the
10   lawsuit?
11        A.     And I just told you the only people that I
12   had contact with at Hartford South after I was laid off
13   there was Joe and Felix.
14        Q.     All right.  And Joe we've already discussed
15   you did not discuss the lawsuit with him.
16        A.     No, I did not.
17        Q.     When is the first time you talked with Felix
18   about the lawsuit?
19        A.     I think after I had got into it and I just
20   went by and asked him for some input.
21        Q.     Okay.  Can you be a little more specific on
22   that?  After you got into it meaning what?  After you
23   contacted an attorney?
24        A.     Yes.
25        Q.     And how did you get in touch with Felix?
```



```
 1        A.    I rode my bike over there and talked to him

 2   for a minute.

 3        Q.    And what did you and Felix talk about?

 4        A.    I told him I talked to an attorney.

 5        Q.    And what was his response?

 6        A.    Well, he was like anybody else, what do you

 7   want me to do?

 8        Q.    And what did you say?

 9        A.    We just had a conversation.

10        Q.    Did you ask him to be a part of the lawsuit?

11        A.    I asked him to be a witness for me.

12        Q.    Would he witness for you?

13        A.    Yeah.

14        Q.    And what did he say?

15        A.    He said he would think about it.

16        Q.    Besides asking him to be a witness for you,

17   did you ask him if he wanted to join with you in the

18   lawsuit?

19        A.    No.  I think I went over and asked him would

20   he be a witness, and then I think once he thought about

21   it, he went in.

22        Q.    But that day you didn't ask him to join the

23   lawsuit with you?

24        A.    No.

25        Q.    And did he give you an answer that day?
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    103

1       A.    No, he called me back later.

2       Q.    **When did he call you back?**

3       A.    A couple days later.

4       Q.    **And what did he say?**

5       A.    He had told me to come by.  I went by there

6  and he told me he would do it.  I made a phone call and

7  gave him the phone and he talked to the people.  That's

8  about it.

9       Q.    **You gave him what phone number, your**

10 **attorney's phone number?**

11      A.    Yes.

12      Q.    **Felix told you that he would be a witness**

13 **for you?**

14      A.    Yes.

15      Q.    **And again, there was no discussion about him**

16 **being part of the lawsuit, just being a witness for you?**

17      A.    I'm not sure how it got that way, but I went

18 over there and I asked him to witness for me.

19      Q.    **Did you ever ask Felix Roman to become part**

20 **of the lawsuit with you?**

21      A.    Not like -- no.  I told you I asked him to

22 witness for me.  I needed a witness.

23      Q.    **Right.  But you never asked him to be a part**

24 **of the lawsuit with you?**

25      A.    No.



1        Q.    All right.  When you met with Felix the

2    first time to give him your attorney's number, did you

3    discuss with him anything that you and your attorney had

4    talked about in terms of the strength or weakness of

5    your case?

6        A.    No, because I had just talked to her and we

7    hadn't even had a conversation anyway.  I asked him to

8    witness for me and he told me he would think about it so

9    it didn't go any further than that.  I gave him a phone

10   number and he called me later.

11       Q.    That's fine.  Now, the second time you met

12   with him when he called you and said come on over and he

13   told you that he would be a witness for you, had he

14   contacted your attorney at that point in time or not?

15       A.    The second time?

16       Q.    Yes.

17       A.    Yeah, he contacted while we were there.

18       Q.    While you were there?

19       A.    Yeah.

20       Q.    Okay.  And what did they discuss?

21       A.    I don't know.  I wasn't there like that.  He

22   gave him -- he gave her his information as far as where

23   to call him and get ahold of him and everything like

24   that.

25       Q.    Did they discuss the issues while you were



1    there?

2         A.    No.

3         Q.    It was just simply to give her his

4    contact --

5         A.    I asked him to be a witness.

6         Q.    Let me finish my question, please.  Was it

7    just to give your attorney his contact information?

8         A.    That's what it was for because I asked him

9    to be a witness, so they needed his phone number and

10   house number so I needed to give that to her to contact

11   him.

12        Q.    But you were there when he made that call?

13        A.    Yes, as far as that.  He gave the

14   information, his phone number, his work phone, and his

15   address.

16        Q.    And that was the end of it?

17        A.    Yes.

18        Q.    Okay.  When did you first learn that Mr.

19   Roman had become part of your lawsuit?

20        A.    Later on in the case.

21        Q.    How much later than this second meeting that

22   you had at Mr. Roman's house?

23        A.    It was a little while.  I can't remember

24   exactly how long.  It was a little while.

25        Q.    After the second meeting at Mr. Roman's



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                        106

```
 1   house when he told you he would be a witness for you,

 2   when's the next time you had any discussions with Mr.

 3   Roman?

 4        A.    The next time?

 5        Q.    Yes.

 6        A.    I don't think we even talked anymore after

 7   that.

 8        Q.    I'm sorry?

 9        A.    I don't think we talked anymore after that.

10        Q.    So after he told you that he would be a

11   witness for you, you didn't have any further

12   conversations with him?

13        A.    No.

14        Q.    How did you find out he was part of your

15   lawsuit?

16        A.    My attorney.  She told me she had talked to

17   him and talked.

18        Q.    But it's your testimony --

19        A.    But he did tell me he was going to witness.

20        Q.    But it's your testimony here today that you

21   haven't had any further contact with Mr. Roman since he

22   told you to come over to his house and told you that he

23   would be a witness for you?

24        A.    No, I haven't had any further contact with

25   him.
```



Orange Legal
800-275-7991

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                          107

```
 1        Q.    And that's through today?

 2        A.    Yes.

 3        Q.    Okay.  Do you text?

 4        A.    A little bit.

 5        Q.    Do you have Mr. Roman's cell phone number?

 6        A.    No.

 7        Q.    Do you have Mr. Thorne's cell phone number?

 8        A.    Yes.

 9        Q.    Have you ever texted with Mr. Thorne?

10        A.    Like early in the morning when I was working

11   there, yeah.  I would let him know I was up at the 7-11

12   waiting on him and stuff like that.

13        Q.    But since you left Hartford South.

14        A.    No.

15        Q.    How long has it been since you've had any

16   contact with Joe Thorne?

17        A.    Okay.  Last time I had contact with him was

18   when I asked for Felix number.  That's how I had to get

19   to Felix house, and that was way, way, way back.

20        Q.    When you went to Felix's house the first

21   time when you rode your bike over?

22        A.    Yeah, that's how I was able to figure out

23   where he stay.

24        Q.    So that would have been before the lawsuit?

25        A.    Yes.
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                  108

```
 1       Q.    And that's the last time you had any contact
 2  with Mr. Thorne?
 3       A.    As far as -- yeah, me doing it, yeah.  He
 4  came by a couple times.
 5       Q.    Well, we talked about that, but I'm asking
 6  about when is the last time?
 7       A.    Yeah, that's the last time.
 8       Q.    So the times he came by your house were
 9  before that?
10       A.    Yeah.
11       Q.    Has Felix ever told you that he, Felix, has
12  had any conversations with Joe Thorne about the lawsuit?
13       A.    I haven't talked to him.
14       Q.    Okay.  To your knowledge, is Joe Thorne
15  assisting you or Mr. Roman with your lawsuit?
16       A.    Say what?
17       Q.    To your knowledge, is Mr. Thorne assisting
18  either you or Mr. Roman with your lawsuit?
19       A.    How could I do that?  I haven't talked to
20  the man.
21       Q.    I'm not asking if you talked to him.
22       A.    You said is he assisting me?
23       Q.    Yes.
24       A.    I don't know.
25       Q.    Is he assisting Mr. Roman to your knowledge?
```



1      A.    I haven't talked to Mr. Roman.

2      **Q.    Okay.  Do you know who Benny Davis is?**

3      A.    Yeah.

4      **Q.    You all listed Benny Davis as a potential**

5  **witness with knowledge in this lawsuit.  What knowledge**

6  **would Mr. Davis have that would be helpful to you in**

7  **this lawsuit?**

8      A.    Okay.  The times we was supposed to be to

9  work.  Several other issues.

10     **Q.    Tell me what those were.**

11     A.    Just several.  I mean, as far as him being

12  there, he knows what time we reported to work, how

13  things were going.

14     **Q.    And besides reporting to work, what time you**

15  **had to report to work, what else -- what other knowledge**

16  **would Mr. Davis have that would be helpful to you in**

17  **your lawsuit about overtime?**

18     A.    What would be helpful?  He was a potential

19  witness as far as I know.

20     **Q.    And who provided his name?**

21     A.    I remembered his name and I think Felix.  I

22  think Felix had probably put his name on there.

23     **Q.    Who is Jeff Dunbar?**

24     A.    Jeff Dunbar was -- matter of fact, that's

25  the Jeff I was telling you about as far as at the



1   beginning of the conversation.

2        Q.    Could it be that Dunbar is not his last

3   name?  I will represent to you that Hartford South can

4   find no record of anyone named Jeff Dunbar ever having

5   worked for them.

6        A.    Okay.

7        Q.    So is it possible that Dunbar is not his

8   last name?

9        A.    Probably.

10       Q.    But this is the gentleman that you were

11   telling me about earlier?

12       A.    Yes.

13       Q.    That I asked you if his last name was

14   Brokenborough?

15       A.    Okay.  That could be.

16       Q.    Okay.  But that's the same person we're

17   talking about?

18       A.    Yes.

19       Q.    Okay.  Besides what time you all reported to

20   work in the morning, are you aware of any other

21   information that Mr. Davis, Benny Davis would have with

22   regard to your claim of overtime?

23       A.    Overtime?  With regards to what he have?

24       Q.    Yeah.  What knowledge would he have?

25       A.    Other than that?  You said other than that?



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                111

```
 1        Q.    No.   Other than what time you had to report
 2   to work in the morning, what other knowledge would Mr.
 3   Davis have with regard to your overtime claims?
 4        A.    Well, he's a supervisor.   He would know how
 5   it works so...
 6        Q.    How what works?
 7        A.    How the clock-in situation works,
 8   everything.
 9        Q.    And what knowledge is it about the clock-in
10   situation --
11        A.    I said knowledge of the overtime situation.
12        Q.    And what specific knowledge would he have?
13        A.    I don't know what he would have.
14             (Defendant's Exhibit No. 5 was marked for
15        identification.)
16   BY MR. BALL:
17        Q.    Mr. Humphries, showing you what we've marked
18   Defendant's Exhibit 5 which is your answers to Hartford
19   South's first set of interrogatories.   I would like you
20   to look through those and make sure those are your
21   answers.
22        A.    Okay.
23        Q.    Are those your answers?
24        A.    You said are these my answers?
25        Q.    Yes.
```



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 112 of 145 PageID 274

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    112

1       A.    As far -- yes.

**2       Q.    Are these your answers to interrogatories?**

3       A.    So you're saying this is something I wrote

4   or said?

**5       Q.    Yes.**

6       A.    I guess.

**7       Q.    Not the front page, but the questions that**

**8   are contained in there and the answers.  Have you ever**

**9   seen this document before?**

10      A.    This is from you?

**11      Q.    No.  That's from you.  Have you ever seen**

**12  this document before?**

13      A.    I ain't type this.

**14      Q.    Have you ever seen the document before?**

15      A.    No.

**16      Q.    I'm not asking if you typed it.  I'm asking**

**17  if you've seen it.**

18      A.    Okay.  This is what this is?  Yes.

**19      Q.    Look at the answers to the questions.  Did**

**20  you provide the information for the answers to these**

**21  questions?**

22      A.    Yeah.

**23      Q.    Okay.  Look at --**

24      A.    Yeah, Jeff Dunbar.  Yep.

**25      Q.    Look at the last page.  Is that your**



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                              113

```
 1   signature on the last page?

 2        A.    Yes.

 3        Q.    Okay.  Before you signed this, did you read

 4   over these answers?

 5        A.    Yes.

 6        Q.    Okay.  So you've seen this before today; is

 7   that true?

 8        A.    Yes.

 9        Q.    Okay.  Now, interrogatory number 1 says,

10   please state the name and address of all persons

11   providing information contained with the answers in

12   these interrogatories, and you have none, but you did

13   provide the information for the answers to these

14   interrogatories?

15        A.    Yes.

16        Q.    Look at interrogatory number 3.

17        A.    What page are you on?

18        Q.    Well, it's question number 3.

19        A.    I see.  Have you heard?

20        Q.    Right.  Have you heard or do you know about

21   any statement or remark made on or behalf of any party

22   to this lawsuit other than yourself concerning any

23   issues in this lawsuit?  And your answer is Joe Thorne,

24   he made comments to Peter Rintelmann about pay increases

25   and issues that I had with receiving my full paycheck
```



```
 1   during some of my work weeks.

 2        A.    Yes.

 3        Q.    Do you see that?

 4        A.    Mm-hmm.

 5        Q.    Okay.  Do you see that?

 6        A.    Yes.

 7        Q.    Okay.  Were you present when Mr. Thorne made

 8   these comments to Peter Rintelmann?

 9        A.    Dennis was there and I'm quite sure, yeah,

10   Peter was there because usually when we get off, he's

11   usually at the shop.

12        Q.    No.  But the answer says that Joe Thorne

13   made comments to Peter Rintelmann about pay increases

14   and issues that I had with receiving my full paycheck

15   during some of my work weeks.  My question to you is

16   were you present when Mr. Thorne made these comments --

17        A.    Yes.

18        Q.    -- to Peter Rintelmann?

19        A.    I was there.

20        Q.    All right.  And you say Dennis Lovett was

21   also there?

22        A.    Yes.

23        Q.    And tell me exactly when this occurred and

24   what was said.

25        A.    This occurred probably about two, two and a
```



1  half months before I actually got laid off, maybe even

2  three months.  I asked for a pay increase and that never

3  went through.

4        Q.    **You asked for a pay increase?**

5        A.    Yeah.  I had been there almost a year.

6        Q.    **So did Mr. Thorne ask in front of you --**

7        A.    Yes.

8        Q.    **-- Mr. Rintelmann to give you a pay**

9  **increase?**

10       A.    Yes.

11       Q.    **And what was Mr. Rintelmann's response?**

12       A.    In exact words?

13       Q.    **Yes.**

14       A.    I'll see what I can do for you, Bud.  Maybe

15  we can turn the water sprinkler on a little bit for you.

16       Q.    **And Dennis Lovett was present?**

17       A.    Yes.

18       Q.    **Anything else said during this conversation**

19  **about a pay increase?**

20       A.    Anything else said about it?

21       Q.    **Yes.**

22       A.    We went there a couple times, like twice I

23  think.  The first time I think he asked Dennis and I

24  think the second time when he did do it, I think it was

25  because Peter was there and he didn't believe that I



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    116

```
 1   thought he had asked because I didn't get anything.
 2        Q.     Okay.  So before this conversation with
 3   Peter Rintelmann being present, you had asked Mr. Thorne
 4   to go to Dennis Lovett about getting a pay increase for
 5   you?
 6        A.     Yeah.  I think I even asked Dennis before
 7   Mr. Thorne went and asked.
 8        Q.     Okay.  And what did Mr. Lovett say, Dennis
 9   Lovett?
10        A.     He said he'll see about it, which never
11   happened.  That's the second time.
12        Q.     You say in this conversation that you had --
13   that Mr. Thorne had with Mr. Rintelmann, Peter
14   Rintelmann and that you were present, Dennis Lovett was
15   present, that there was also some discussion about you
16   receiving your full paycheck during some of your work
17   weeks.  Was that also discussed?
18        A.     Yes.
19        Q.     Okay.  Tell me what was discussed about
20   that.
21        A.     Okay.  Like I was telling you, I had a
22   couple of issues where my actual paycheck wasn't the
23   right time.  The times weren't there, all the money
24   wasn't there.  A couple of days, like you were saying in
25   here, that were missing, I was there; but if they didn't
```



**Orange Legal**
**800-275-7991**

 1   know my name, they didn't write it down so...

 2        Q.    And what did Mr. Rintelmann say to Mr.

 3   Thorne with respect to that issue or to you?

 4        A.    I don't think that was tooken up with him.

 5   I think that was between him and Dennis as far as the

 6   missing money, time, and me not being on the roster.

 7        Q.    Okay.  So that was between Mr. Thorne and

 8   Mr. Lovett?

 9        A.    Yes.

10        Q.    And were you present during this, or did Mr.

11   Thorne do this on your behalf?

12        A.    I think he did it on my behalf because I was

13   on the roof.  He called Dennis and told Dennis something

14   and then when he came back in, he went in there and

15   talked to him.

16        Q.    And this was what we talked about earlier

17   where you said that they in fact did square up your pay

18   on that?

19        A.    Yeah, he gave me a deposit.

20        Q.    Okay.  So you're not claiming that you're

21   owed any money on that?  That was taken care of?

22        A.    At that point in time, yeah, that was taken

23   care of, but it happened several times.

24        Q.    Right.  But it was taken care of?

25        A.    (Witness nods head).



1        Q.    Is that a yes?

2        A.    Okay.  Yeah.

3        Q.    Okay.  So look at interrogatories number 5

4    and 6, and we talked about this earlier in your

5    deposition.  The traveling to and from the job site each

6    day and the company provided transportation.

7        A.    Mm-hmm.

8        Q.    Outside of just riding to and from the job

9    site, you may have been talking about what you did, but

10   you weren't asked to do any physical work in the truck,

11   correct?

12       A.    No.

13       Q.    And you weren't asked to do any paperwork,

14   you weren't responsible for filling out any paperwork?

15       A.    No.

16       Q.    Correct?

17       A.    No.

18       Q.    So it's your allegations in this lawsuit

19   that you should have been paid for time riding to and

20   from the job site; is that correct?

21       A.    Yeah.

22       Q.    Okay.  I believe you also contend in this

23   lawsuit that you believe you should be paid for any work

24   that was done in the mornings before you left the yard;

25   is that correct?



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                   119

```
 1      A.    Positive.

 2      Q.    I'm sorry.  I'm not understanding what

 3  you're saying.

 4      A.    Yes.

 5      Q.    Let's talk about on and off the roof.  Do

 6  you have any evidence that would show that you were not

 7  paid for the time that you got to the job site until the

 8  time you left the job site?

 9      A.    You said do I have any?

10      Q.    Evidence.  Any documentation that would show

11  that you were only paid when you were on the roof as

12  opposed to being paid once you got to the job site and

13  when you left the job site?

14      A.    So you said do I have any evidence of work I

15  performed?

16      Q.    I'll try to rephrase it.

17      A.    Yeah.

18      Q.    Do you have -- I believe you're contending

19  that you were not paid from the time you got to the job

20  site until you got on the roof, and you weren't paid

21  from the time you got off the roof until you left the

22  job site; is that correct?

23      A.    So you're saying I wasn't paid until I got

24  to the job site which, yeah, because they didn't pay us

25  for coming to the yard, putting stuff in the back of the
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    120

 1   truck.  That's what we discussed earlier.

 2          Q.    That part I understand.  Okay.  Let's talk

 3   about when you get to the job site.

 4          A.    Okay.

 5          Q.    Were you paid from the time you arrived at

 6   the job site in the truck until the time you left in the

 7   truck?

 8          A.    Supposed to be from the time we got on the

 9   roof to the time we left the roof.

10          Q.    And that's what I'm talking about.  So it's

11   your contention that the time you got there in the truck

12   until the time you got on the roof you weren't paid for?

13          A.    Yes.

14          Q.    And from the time you got off the roof until

15   you left in the truck you were not paid for?

16          A.    Yes.

17          Q.    Do you have any evidence that would support

18   that claim?  Do you have anything --

19          A.    Yeah.

20          Q.    -- that would support that?

21          A.    I don't have no physical evidence of it.  I

22   didn't take pictures every time I left.  I didn't have a

23   camera loaded.

24          Q.    Well, do you know from your paycheck that

25   the only time you were being paid is while you were on



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    121

```
 1   the roof?

 2         A.     Yeah, I know that because I always came up

 3   with 40 hours unless there was somewhere that he decided

 4   to give me that extra travel time.  Anything else was

 5   just 40 hours.  You never came up with more than 40

 6   hours.

 7         Q.     And that was, what, 7 to 3:30?

 8         A.     That's exactly.

 9         Q.     Well, you got to the job site at 7, right?

10   You said you left the yard at 6:30 and it would take you

11   25 minutes to get to the job site?

12         A.     Give or take where you were going.

13         Q.     Okay.  So you got there at 7.  You said you

14   left the roof around 3 or 3:15 and left in the truck by

15   3:30, correct?

16         A.     No.  We started cleaning up about 3:15,

17   3:00.

18         Q.     Right.  And then you would leave the job

19   site at 3:30?

20         A.     Mm-hmm.

21         Q.     So in other words, you were being paid from

22   the time you got to the job site until the time you left

23   in the truck at 3:30?

24         A.     Mm-hmm.

25         Q.     Is that a yes?
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    122

```
 1        A.    Yes, that's what it seems to be.

 2        Q.    All right.  With respect to safety meetings,

 3   tell me about the safety meetings.

 4        A.    I only attended one safety meeting since I

 5   was there.

 6        Q.    Okay.  And what time did that occur?

 7        A.    I think it occurred like 6.  Everybody was

 8   supposed to be there at 6 for that too.

 9        Q.    How long did that last?

10        A.    Roughly about maybe 15, 20 minutes.

11        Q.    Okay.  And you only attended one while you

12   were there?

13        A.    I can only remember that one.

14        Q.    Okay.  Were you ever required to take any

15   CPR training?

16        A.    I already had that.

17        Q.    So the company did not require you to take

18   any CPR training?

19        A.    I had that, hazmat materials, all kind of

20   stuff I got already.

21        Q.    But the company did not require you to take

22   any of that training?

23        A.    As far as I knew, they never said nothing,

24   but I do have that stuff in my car.

25        Q.    Right.  So the only training that -- the
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                123

```
 1   only training with respect to your employment with

 2   Hartford was that one safety meeting that you said you

 3   attended?

 4        A.    Yeah.

 5        Q.    Now, we talked earlier in your deposition

 6   and you said when you got back to the yard, you would

 7   catch the bus and go home?

 8        A.    Mm-hmm.

 9        Q.    Is that a yes?

10        A.    Yes.

11        Q.    And in your answer to interrogatory number

12   10 it says, I was required to return to the shop and

13   unload the truck and return leftover supplies to their

14   designated places within defendant's facility.  Is

15   that --

16        A.    Yes, that is true; but like I told you, it

17   didn't happen all the time.

18        Q.    Well, how often did it happen?

19        A.    It did happen.

20        Q.    About once a month?

21        A.    You said once a month like...

22        Q.    I'm trying to figure out how often.  You

23   said it didn't happen often, but how often did it

24   happen?

25        A.    It didn't happen every day.  That's what I
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                              124

```
 1   said.  It didn't happen every day.  We had to go take
 2   the stuff off, but several times it did.
 3        Q.     You're going to have to -- sorry.  You have
 4   to speak up a little bit.
 5        A.     Several times it has happened.
 6        Q.     How many times since you've been employed by
 7   Hartford South did it happen?
 8        A.     I didn't keep a tally mark system on it, but
 9   give or take.
10        Q.     Give or take what?
11        A.     I would say probably about 35 percent.
12        Q.     Thirty-five percent of the time you had to
13   unload the truck?
14        A.     Yeah, take some materials off and replace
15   them back there if we didn't use them all, whatever.
16        Q.     I thought you testified earlier that when
17   you got back to the yard, that someone came and got the
18   truck and took it back to the warehouse?
19        A.     That always happened because they refuel the
20   truck and park the truck back, but there were several
21   times that we had things we had to take off the truck
22   and put back in there.  Now, I'm not telling you every
23   day we had to go take stuff off the truck; but if we
24   came back in in the morning and that stuff was still on
25   the truck, we had to take it off there and put it back
```



**Orange Legal**
**800-275-7991**

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    125

 1   too.

 2        Q.    Well, that's in the morning.  I'm talking

 3   now specifically about the afternoons.

 4        A.    And I just told you it happened.

 5        Q.    And you said 35 percent of the time?

 6        A.    Yeah.

 7        Q.    So three out of every ten days?

 8        A.    That could happen.

 9        Q.    And who would take the stuff off the truck?

10        A.    Either me and Joe or whoever that was in

11   there.  Juan took things back several times.  As far as

12   the -- Naptha, whatever you call that crap.

13        Q.    I'm sorry?

14        A.    Naptha or whatever you call that crap goes

15   back in that closet.

16        Q.    And how long would that take on average?

17        A.    On average, five, ten minutes.  Throwing the

18   stuff in the trash, crap that's left in the back there.

19        Q.    Was there times that you -- you didn't do it

20   and somebody else would do it?

21        A.    Yeah, I just told you that.

22        Q.    So this 35 percent of the time that you're

23   talking about wasn't you specifically.  It's just how

24   often perhaps it had to happen with the truck.

25        A.    The 30 percent of the time is usually me



 1   taking it off of there because most of us -- most of

 2   them would leave as soon as they got in the yard.  Since

 3   I knew Joe had to pick up paperwork, I would give tools,

 4   whatever I had in there, all the other stuff, water, all

 5   that other crap.

 6        Q.    And that's when you rode with Joe?

 7        A.    Yeah.

 8        Q.    What about when you didn't ride with Joe,

 9   would you just leave the yard?

10        A.    Yeah.

11        Q.    Okay.  So really the times you're talking

12   about then when you rode with Joe was the last two, two

13   and a half months before your layoff?

14        A.    About three months.  I told you I rode with

15   him roughly about three months.

16             MR. BALL:  All right.  Let's take a break

17        for just a moment.

18             (Recess taken -- 1:03 p.m.)

19             (After recess -- 1:09 p.m.)

20   BY MR. BALL:

21        Q.    During the time that you were employed by

22   Hartford South, did you ever hear about anyone taking

23   anything from Hartford South, stealing anything?

24        A.    Oh, man, I don't like to get in that kind of

25   thing because that's hearsay, see say (sic).



1        Q.      Well, what have you heard?

2        A.      Oh, boy, you got to look at the type of work

3   environment you're in.  You're in the construction

4   trade.

5        Q.      Right.

6        A.      Most of the time people have a record that

7   does construction, that's where they go, right?

8        Q.      Okay.

9        A.      So you can imagine the amount of crap you'll

10  hear.

11       Q.      All right.

12       A.      I've heard crawlers been missing, all kind

13  of stuff.

14       Q.      You ever seen anyone take anything?

15       A.      Not that I know of.

16       Q.      You ever seen anyone take any gas, gasoline

17  from company trucks?

18       A.      No.

19       Q.      During the times you rode with Joe Thorne,

20  Joe Thorne ever have any gas cans in his car or his

21  truck?  Did he have a truck?  I guess I should have

22  asked that first.

23       A.      Well, he had an Expedition, yeah.  You can

24  say a truck, sports utility, truck.

25       Q.      All right.  Did he ever have any gas cans in



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    128

```
 1   there?
 2        A.    Not that I knew of.
 3        Q.    Did he ever tell you that he had ever taken
 4   any gasoline from the Hartford South?
 5        A.    No.
 6        Q.    How about Felix Roman, you ever see Felix
 7   put any gas cans in his truck?
 8        A.    No.  Not as far as I knew.
 9        Q.    Have you heard about anyone taking any
10   gasoline from company vehicles at Hartford South?
11        A.    I didn't have a car, so no, I don't --
12        Q.    I'm just asking --
13        A.    I didn't hear about it.
14        Q.    You've heard about other kinds of stealing
15   but not gasoline?
16        A.    Yeah, I never heard of that.
17        Q.    Okay.
18        A.    As far as tools and stuff, I've heard
19   things, yeah.
20        Q.    Have you ever heard anything about any kind
21   of theft involving either Joe Thorne or Felix Roman?
22        A.    Most of the time I've heard of it -- and
23   you're saying this is going to stay here or what?
24        Q.    I'm just asking have you heard --
25        A.    No, not involving those two.
```



Orange Legal
800-275-7991

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    129

```
 1        Q.    Not involving those two.
 2        A.    I've heard the same thing he's probably
 3   heard.
 4        Q.    But not involving Joe Thorne or Felix Roman?
 5        A.    No.
 6        Q.    So I want to be sure before we leave today
 7   that I understand exactly what your overtime claims are.
 8   You're claiming that you should be compensated to and
 9   from work, excuse me, to and from the job site and
10   riding in the company vehicle, correct?
11        A.    Yes.
12        Q.    You're claiming that you should be
13   compensated in the morning for any work done before you
14   left the yard?
15        A.    Yes.
16        Q.    There are some instances you've now said
17   where you have returned to the yard in the afternoon
18   where you did some work that you feel you should be
19   compensated for?
20        A.    Yes.
21        Q.    And then is there anything else that we
22   haven't talked about that you believe you should be
23   compensated for?
24        A.    As far as I know.
25        Q.    As far as you know what?  That's it?
```



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    130

```
 1    A.    Yeah.

 2          MR. BALL:  All right.  I don't have any

 3    further questions.

 4          MS. KIM DE ARCANGELIS:  I don't have any

 5    questions.  After we order, which I don't know if

 6    you're ordering now anyway, but when the deposition

 7    is transcribed, you have the opportunity to either

 8    read the transcription or you can waive reading of

 9    that.  Most people waive it.  If you feel that for

10    some reason maybe she didn't accurately take down

11    the things that you were saying, you may want to

12    read it, but that's up to you.  Most people waive.

13          Read or waive?

14          THE WITNESS:  Yeah, I would like to read it,

15    but not right now.

16          MS. KIM DE ARCANGELIS:  No.  It will be a

17    while.  Okay.  If it's ordered, we'll make

18    arrangements.

19          MR. BALL:  I will not order at this time.

20          (The deposition was concluded at 1:14 p.m.)

21

22

23

24

25
```



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 131 of 145 PageID 293

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                              131

```
 1                    CERTIFICATE OF OATH

 2

 3   STATE OF FLORIDA:

 4   COUNTY OF ORANGE:

 5

 6          I, Sara Miller, Stenograph Reporter, Notary

 7   Public, State of Florida, certify that JONATHAN

 8   HUMPHRIES, personally appeared before me on this 13th

 9   day of October, 2016, and was duly sworn.

10       Witness my hand and official seal this 16th day of

11   November, 2016.

12

13

14                         Sara Miller

15                         Sara Miller
                           Notary Public-State of Florida
16                         My commission Expires: 7/14/2020
                           My commission No. FF 982771

17

18

19

20

21

22

23

24   Produced Identification: Driver's License

25
```



```
 1              REPORTER'S DEPOSITION CERTIFICATE

 2

 3   STATE OF FLORIDA:

 4   COUNTY OF ORANGE:

 5

 6        I, SARA MILLER, a Notary Public of the State

 7   of Florida, County of Orange, do hereby certify that I

 8   was authorized to and did stenographically report the

 9   foregoing deposition of JONATHAN HUMPHRIES; that a

10   review of the transcript was requested; and that the

11   transcript, pages 4 through 130 is a true and complete

12   copy of the stenographic notes.

13        I further certify that I am not a relative,

14   employee, attorney, or counsel of any of the parties,

15   nor am I a relative of employee of any of the parties'

16   attorney or counsel connected with the action, nor am I

17   financially interested in the outcome of this action.

18   Dated this 16th day of November, 2016.

19

20

21

22   _____

23              Sara Miller,
                Stenograph Shorthand Reporter
24

25
```



Case 6:16-cv-00109-GAP-KRS  Document 31-1  Filed 01/03/17  Page 133 of 145 PageID 295

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    133

```
 1              ERRATA AND SIGNATURE SHEET

 2    DO NOT WRITE ON THE TRANSCRIPT - ENTER CHANGES HERE

 3    IN RE: JONATHAN HUMPHRIES and ROMAN FELIX v. HARTFORD
      SOUTH, LLC, a Florida Limited Liability Company
 4
      CASE NO.: 6:16-cv-00109-GAP-KRS
 5
      DATE:    October 13, 2016
 6
      DEPONENT: JONATHAN HUMPHRIES
 7
      PAGE #    LINE #     CORRECTION & REASON
 8    ---------------------------------------------------------
 9    _____
      _____
10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    Under penalties of perjury, I declare that I have read
      the foregoing document and that the facts stated are
24    true.

25    DATE:_____DEPONENT NAME:_____
```



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 134 of 145 PageID 296

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                              134

11/17/2016

JONATHAN HUMPHRIES
C/O  KIM DE ARCANGELIS, ESQUIRE
OF:  Morgan & Morgan, P.A.
     20 North Orange Avenue, 14th Floor
     Orlando, Florida 32801
     KimD@forthepeople.com

Re:  10/13/16 DEPOSITION OF JONATHAN HUMPHRIES
JONATHAN HUMPHRIES and ROMAN FELIX v. HARTFORD SOUTH,
LLC, a Florida Limited Liability Company

Dear Sir/Madam:

     This letter is to advise that the transcript of the
above-referenced deposition has been completed
and is available for review.  Please contact our
office at (800) 275-7991 to make arrangements
to read and sign or sign below to waive review of this
transcript.
     It is suggested that the review of this
transcript be completed within 30 days of your
receipt of this letter, as considered reasonable
under Federal Rules*; however, there is no Florida
Statute to this regard.
     The original of this transcript has been
forwarded to the ordering party and your errata, once
received, will be forwarded to all ordering parties.


                              Sincerely,


                              SARA MILLER
                              Orange Legal, Inc.

Cc:  STEPHEN T. BALL, ESQUIRE

WAIVER:
I, _____ hereby waive the reading &
signing of my deposition transcript.



_____     _____
Deponent Signature               Date

*Federal Civil Procedure Rule 30(e)/Florida Civil
Procedure Rule 1.310(e)



**Orange Legal**
**800-275-7991**

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    Index: $12..affirm

### Exhibits

**101316_J. Humphries_ Exhibit 1** 3:12 13:1, 4,5

**101316_J. Humphries_ Exhibit 2** 3:13 38:9, 13

**101316_J. Humphries_ Exhibit 3** 3:14 41:5

**101316_J. Humphries_ Exhibit 4** 3:15 50:18

**101316_J. Humphries_ Exhibit 5** 3:16 111:14,18

### $

**$12** 39:5 43:19

**$20** 54:24

### 1

**1** 12:25 13:1,5 52:15 55:15 56:9,13 57:3,8 113:9

**1/6/2015** 52:25

**10** 54:16 55:19 57:12 75:3 97:8 123:12

**100** 36:19,23 74:13

**11** 35:17,19 54:16

**11/14** 51:23

**11/20/2015** 53:20

**11/4/2014** 51:10

**12** 43:21 54:17 55:25

**12/2/2014** 52:3

**12/30** 52:21

**12/30/2014** 52:20

**12/9** 52:12

**12/9/2014** 52:10,13

**125** 35:17,19

**12th** 53:5,21

**13** 55:25 56:18

**13th** 53:5,21

**14** 55:18,25 56:18 57:16

**14th** 53:5,22

**15** 29:11 55:25 61:1 67:16 73:17 75:3,8 97:8 122:10

**15th** 53:6,22

**16** 54:8 56:18 57:16

**17** 54:8,16 56:18

**17th** 55:6

**18** 28:23 35:20 54:8 56:3 57:17 60:15 97:12

**19** 54:8 56:3

**1994** 13:10

**19th** 55:6

**1:03** 126:18

**1:09** 126:19

**1:14** 130:20

### 2

**2** 38:9,13 54:4 55:15 56:9 57:8

**2/10/2015** 54:3

**2/24/2015** 54:7

**2/3/2015** 53:25

**20** 53:4 55:3 56:3 67:17 73:17 74:13,16 122:10

**2000** 97:12

**2004** 10:8 47:3

**2005** 10:8 42:23 47:3,8 49:6,9

**2006** 42:24

**2007** 10:22,23 12:5, 24 17:12

**2008** 17:12

**2013** 20:2

**2014** 20:2 22:10 28:22 38:23 44:3

**2015** 28:23 44:3 53:4 54:10,16 55:8,14,18, 21 56:2 57:1,3,7 97:13

**2016** 20:5,10 39:23

**20th** 55:6

**22** 52:23 57:17

**23** 8:16 52:23

**23rd** 54:11

**24** 52:23 57:5

**24th** 52:1 54:11

**25** 55:10 57:1 76:6 78:6 121:11

**25th** 54:11

**26** 55:10 56:6 57:5

**26th** 54:11 56:2

**27** 38:22 54:1 55:10 57:5

**28** 28:22 54:1 56:6 57:5

**28th** 22:10 39:1 51:13

**29** 53:1 54:1 55:22 56:6,12

### 3

**3** 41:5 48:24 51:16 54:4,10 113:16,18 121:14

**3/17/79** 5:9

**3/24/2015** 55:4

**30** 27:9 53:1 54:1 55:15,22 78:6 80:23 91:3 125:25

**31** 53:1 55:8,15 57:8

**32808** 5:3

**35** 124:11 125:5,22

**3:00** 81:19 121:17

**3:15** 81:8,10,18,19, 20 121:14,16

**3:30** 81:3,4,24,25 82:1,3 121:7,15,19, 23

### 4

**4** 50:18,22 51:16,17 52:15 54:4 56:9 57:8

**40** 121:3,5

**407-575-0634** 5:5

**45** 36:12

**4714** 4:20

**48** 73:20

**49** 60:11

**4:15** 35:25 36:2,4,7

**4:20** 36:1,2,4,7

**4:30** 37:8,13

### 5

**5** 37:8,14 51:17 55:21 56:9 111:14,18 118:3

**5/19/2015** 55:24

**50** 75:15 76:6

**5:45** 60:25

### 6

**6** 36:8 54:4 55:19 61:7 118:4 122:7,8

**6/2/2015** 56:5

**6/9/2015** 56:8

**6:30** 64:6,11,14 77:13,16 78:5 121:10

**6:45** 64:6

### 7

**7** 51:17 55:14 121:7, 9,13

**7-11** 107:11

**7/21/2015** 56:17

**7/7/2015** 56:12

**75** 51:20 75:15

### 8

**8** 55:19

**8/12/2015** 56:20

### 9

**9** 54:16 55:19 57:7,12

**9/1/2015** 56:25

**9/15/2015** 57:11

**9/22/2015** 57:15

**93** 10:21,23 12:24 13:11

**94** 13:12

**96** 17:4

**97** 5:15

**98** 16:20

### A

**AC** 21:12

**account** 66:18

**accurate** 52:7 58:8 66:18

**accurately** 130:10

**acquitted** 15:16

**actual** 27:15 29:13 59:3 116:22

**address** 4:19 7:10, 14 49:17,18 59:21 105:15 113:10

**affirm** 4:2



**Orange Legal**
**800-275-7991**

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES

**afternoon** 80:6 81:17 129:17

**afternoons** 83:2 125:3

**agree** 41:8

**ahead** 10:20 41:3

**ahold** 104:23

**Air** 10:3,4 22:1

**allegations** 118:18

**alleged** 11:20

**allowed** 34:17

**amount** 127:9

**answering** 6:4

**answers** 6:6 111:18, 21,23,24 112:2,8,19, 20 113:4,11,13

**antagonize** 8:10

**antagonizing** 8:11

**anybody's** 22:24

**anymore** 84:10 95:21 98:12 106:6,9

**apologize** 33:21

**appears** 51:10 52:2 54:19 60:14

**application** 22:18 24:4,7,12 38:13 42:4 48:25

**apply** 100:8

**appointment** 32:10 33:7,13

**Approximately** 28:25

**April** 55:14,15,18, 19,22

**ARCANGELIS** 6:23 7:19 9:7 14:23 15:7,12,15,18 130:4, 16

**area** 16:21,23 35:23 48:8

**areas** 62:25

**armed** 11:2,8,20

**arrangements** 130:18

**arrested** 12:8

**arrive** 60:20

**arrived** 120:5

**asks** 39:11

**assisting** 108:15,17, 22,25

**assumed** 62:7

**assuming** 26:10 55:2 68:18 93:8

**attempt** 14:22

**attempted** 14:20 15:6

**attended** 122:4,11 123:3

**attention** 39:10

**attorney** 94:14 101:23 102:4 104:3, 14 105:7 106:16

**attorney's** 103:10 104:2

**audibly** 15:4

**August** 57:1,5,8

**authorized** 40:14

**Auto** 58:18

**Avenue** 50:2

**average** 125:16,17

**aware** 43:10 88:17 110:20

**B**

**B&d** 19:15,16,20,25 20:12,16 22:17 44:6 45:8,25 46:20 47:5, 22 48:5 49:2,9

**B-a-k-a-r-i** 4:18

**back** 10:1 14:11 22:4 24:11,15 42:15 43:22 44:3 46:4 57:3 61:4,14,22 68:5,12 73:8 75:20 80:5,7, 11,25 82:4,13,20

83:9 85:7,8 86:20 88:2 90:23,24 92:20 93:16 94:23 95:10 103:1,2 107:19 117:14 119:25 123:6 124:15,17,18,20,22, 24,25 125:11,15,18

**backed** 62:11

**background** 13:5

**backwards** 19:12

**bad** 38:17

**bag** 72:10,11 73:16

**Bakari** 4:16

**Baker** 7:21 8:15

**BALL** 4:11 7:1,22 9:9 12:25 13:3 15:1, 10,14,17,19 38:11 41:3,7 50:20 111:16 126:16,20 130:2,19

**basically** 79:24 85:5 99:22 100:1

**basis** 68:25 69:8,13 71:18 72:6 73:7,11 81:9 93:21

**Basso** 58:17

**Baywillow** 4:20,21 7:10,14

**beer** 95:4,5,6,7,9,17, 19 97:7

**began** 9:13

**beginning** 110:1

**behalf** 113:21 117:11,12

**bell** 28:4

**Benny** 25:24 27:15, 16 109:2,4 110:21

**big** 20:22 71:1,14 81:20 89:23

**bike** 102:1 107:21

**bills** 46:5

**birth** 5:8

**bit** 40:4 107:4 115:15 124:4

**board** 62:15,17,18

**boards** 67:25

**box** 71:11 78:11,12, 13,14

**boy** 25:8 28:1 29:2 74:8,14 127:2

**break** 27:9 50:15 126:16

**bring** 37:5 62:5 69:6 71:9,11,13

**brings** 71:10

**Brokenborough** 24:17 110:14

**bucket** 71:25 72:1, 17

**buckets** 72:14,15 73:16

**bucks** 43:21 55:3

**Bud** 115:14

**Buddy** 47:25 48:2,3

**bunch** 90:14

**bus** 30:24 35:8,15,19 36:1,2,3,5,8,18 37:3, 10 42:3 43:7,8,13,17 60:23,24 80:12,14, 18,19 82:12,14,20 83:5,8 123:7

**buses** 35:17,21 80:21

**business** 12:18 18:10 19:20 20:17, 20,22 100:7

**C**

**calculation** 60:11

**call** 15:21 21:21 60:2 62:19 72:17,18 73:21 85:20 86:3,20 87:10 88:2 92:25 95:16 100:17 103:2, 6 104:23 105:12 125:12,14

**called** 51:5 59:22,23 90:3 92:19 95:10 103:1 104:10,12 117:13

**calling** 93:1

**calls** 69:4

**camera** 120:23

**cans** 127:20,25 128:7

**car** 35:12 43:18 82:24 87:11 95:13, 14 122:24 127:20 128:11

**card** 39:25 40:6,7, 13,22,23 41:1,15

**care** 21:12,13 66:9 117:21,23,24

**carries** 39:25

**carry** 71:14 75:14 76:1

**carrying** 75:18

**case** 11:7,9 13:17 14:2 104:5 105:20

**cases** 46:8,10

**catch** 34:21 35:22 36:2 37:1,3 80:18 123:7

**catching** 42:3 82:14

**caught** 30:24 35:8 82:12

**cell** 5:6,7 107:5,7

**certificate** 17:14,17, 18,24 18:4

**certificates** 18:2,12

**change** 25:5

**charge** 12:4

**Chattanooga** 48:10

**check** 13:5 51:5,10 52:3,10,13,20,25 53:4,20,24 54:3,7,10 55:4,8,14,18,21,24 56:2,5,11,17,20,25 57:1,3,7,11,15 59:13 93:16

**child** 8:1

**children** 5:18

**cigarettes** 61:3 63:25



**Orange Legal**
**800-275-7991**

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES

**circumstances** 14:5,7 44:6 82:7

**citation** 42:9

**claim** 110:22 120:18

**claiming** 117:20 129:8,12

**claims** 111:3 129:7

**clean** 62:24

**cleaning** 19:24 20:14 81:19 121:16

**clear** 76:13

**climber** 18:7

**clock-in** 111:7,9

**closet** 125:15

**clutter** 75:21

**coffee** 61:5 64:1

**coke** 76:21

**collections** 91:4

**College** 17:9

**comments** 113:24 114:8,13,16

**Community** 17:9

**company** 10:3 32:20 34:18,22 43:1 45:15 98:12 118:6 122:17, 21 127:17 128:10 129:10

**compensated** 129:8,13,19,23

**complained** 15:25 16:5

**complaints** 15:25 16:5

**completed** 29:22 30:7

**completion** 17:25

**concealed** 13:23

**concluded** 130:20

**conduct** 16:6

**confirmed** 95:1

**constantly** 45:22

**construction** 19:22, 23 20:1 127:3,7

**consuming** 74:2

**contact** 97:10 99:5 100:14 101:7,12 105:4,7,10 106:21, 24 107:16,17 108:1

**contacted** 94:14,25 101:23 104:14,17

**contained** 112:8 113:11

**containers** 71:24

**contend** 118:22

**contending** 119:18

**contention** 57:22 58:25 120:11

**continue** 45:25

**convenience** 33:10

**conversation** 6:22 90:5 92:7,16,22 93:4,13 95:3 99:23 100:1 102:9 104:7 110:1 115:18 116:2, 12

**conversations** 89:6 106:12 108:12

**convicted** 11:4,8 12:6 40:1

**Cook** 19:2

**copy** 15:12

**Corner** 36:22

**corporate** 20:19

**correct** 28:23 37:11 39:3,16 51:12,14,17 52:2 53:6,22 59:20 60:7,16 70:21 77:20 81:15 90:1 118:11, 16,20,25 119:22 121:15 129:10

**corrected** 60:4

**correctly** 99:8

**costs** 46:4,18

**counted** 29:4

**County** 10:10

**couple** 35:17 60:3 97:11,13 99:9 103:3 108:4 115:22 116:22,24

**court** 4:2,20 6:2 7:3, 10 12:2 31:14 46:3, 4,18 90:21,22 91:1,5

**covered** 93:20

**CPR** 122:15,18

**crane** 71:4,5,7,8,10

**crap** 45:22 46:5 125:12,14,18 126:5 127:9

**crawler** 72:19,21,22

**crawlers** 127:12

**crew** 25:17 26:1,24, 25 28:8,13,14 29:20 30:2,9 31:21 32:1 59:3 63:24 64:3,16, 23 66:9,10,11 78:20

**crews** 26:25 32:2 53:11 57:20

**crime** 40:1

**criminal** 46:13

**current** 7:9 17:19,23

**customary** 81:9

**D**

**daily** 68:25 69:8,13 71:18 72:6 73:7,11

**date** 5:8 12:15 38:22 39:23 51:5,10 52:3, 10,13,20,25 53:4,20, 24 54:3,7,10 55:4,8, 14,18,21,24 56:2,5, 11,17,20,25 57:1,3,7, 11,15

**Davis** 109:2,4,6,16 110:21 111:3

**Davis'** 25:24

**day** 24:6,10,11 25:25 27:20 28:9 29:14 30:2,23 32:13 38:5 39:1 52:2,4 54:24

57:2,21 63:5,7 66:20 68:4,6,12 69:9,10 70:10 72:3 80:25 83:9 84:2,4,7,15,16 86:4,7 87:1,8 88:10, 11,12,13 89:7,9 90:4 92:8 94:25 95:3 97:6,9 102:22,25 118:6 123:25 124:1, 23

**days** 51:11,14,17 52:1,11,15,22 53:1, 5,21,25 54:7,10,16 55:5,9,15,18,21,24 56:2,5,8,12,17 57:4, 7,11,15,21 60:15 65:14 91:3 103:3 116:24 125:7

**DE** 6:23 7:19 9:7 14:23 15:7,12,15,18 130:4,16

**December** 52:15 53:1

**decide** 43:8

**decided** 45:15 121:3

**deck** 72:25

**defendant** 9:17

**defendant's** 12:25 13:1,4 38:9,12 41:5 50:18,22 111:14,18 123:14

**degree** 13:18 14:20 17:13

**degrees** 18:12

**deliver** 71:2

**Dennis** 23:21,22 24:15 25:9,10 35:3 40:20,21 41:13 59:24 60:1 79:14 86:21 87:13,15 88:3, 8 89:18,19 90:3,10 92:9,17 93:2,4,20 94:6,11 95:10,19 96:2 114:9,20 115:16,23 116:4,6,8, 14 117:5,13

**depend** 53:17 81:14

**depends** 35:18 63:17 64:10 66:1,17

**67:17,19,25 69:16, 21 72:16 77:19,22 81:20**

**deposit** 117:19

**deposition** 5:20 6:2, 18 15:20 118:5 123:5 130:6,20

**designated** 123:14

**determine** 66:19

**Diego** 25:22 27:16 58:10

**dig** 71:11

**DIRECT** 4:10

**discrepancies** 53:12

**discrimination** 16:9

**discuss** 33:15 83:11 93:22 96:15 97:16, 20,22 101:15 104:3, 20,25

**discussed** 101:14 116:17,19 120:1

**discussion** 96:4 103:15 116:15

**discussions** 89:8 96:6 106:2

**Disney** 84:5,6

**dispatch** 48:3

**dispute** 52:8

**distance** 54:20

**doctor** 32:11 33:7 97:2

**doctor's** 32:9 33:12

**document** 112:9,12, 14

**documentation** 119:10

**dog** 68:11,17

**domestic** 12:2,4

**DOT** 44:23,24 45:11

**downtown** 36:9,13, 15,25 80:23



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                              Index: drainage..GED

**drainage** 20:15

**drank** 64:1 95:6

**drink** 61:5

**drive** 31:5,9 32:4,7, 15 33:3,17,23 34:12, 17 35:7,9 40:14 42:10 50:2 61:16,18 67:5,10 82:24

**driven** 31:1

**driver** 42:9

**driver's** 39:12,15, 20,25 40:7,8,10,12, 17 41:9,14,19,24 42:5,11,22 44:7,11, 20 46:7,11,12,19,23 47:3,4,17,20

**drives** 86:25

**driveway** 95:15

**driving** 12:1 37:10 44:19

**drop** 95:8

**dropped** 87:3

**drops** 36:18 87:1,5

**drove** 30:24 33:10, 11 43:18 44:15 62:9 67:3,10,12 94:24

**drug** 22:2

**due** 46:4 49:7

**duly** 4:8

**Dunbar** 109:23,24 110:2,4,7 112:24

**duties** 68:14 78:11

**dwelling** 12:18,19 13:14 14:16

**E**

**e-mail** 100:15

**earlier** 24:16 31:25 81:1 100:4 110:11 117:16 118:4 120:1 123:5 124:16

**earliest** 36:1

**early** 32:10 63:24 107:10

**easier** 6:2

**education** 17:8

**effect** 85:14

**either/or** 35:22

**elbow** 79:23

**elected** 49:11

**emphasis** 82:24

**employed** 13:6 18:17 19:3 22:8,15 49:10 124:6 126:21

**employee** 101:5

**employees** 64:2

**employer** 10:4 15:21 16:1,6 18:19 19:13 21:16,20

**employers** 22:5 49:2

**employment** 21:16 22:6 37:25 38:13 48:24,25 49:1 83:21 84:13 94:25 123:1

**end** 22:13,15 55:3 68:4 74:25 83:9,22 84:14,16 93:8 105:16

**ends** 100:7

**English** 28:3 58:21

**Enterprises** 19:15, 16,21 20:13,16

**entire** 25:4

**environment** 127:3

**equipment** 78:16

**evidence** 119:6,10, 14 120:17,21

**exact** 115:12

**EXAMINATION** 4:10

**examined** 4:8

**exception** 15:24 16:4

**excuse** 28:22 52:3 55:9 56:25 57:17 80:6 129:9

**Exhibit** 13:1,4 38:9, 13 41:5 50:18 111:14,18

**expect** 35:4

**Expedition** 127:23

**expensive** 43:22,24 44:5

**experience** 22:19

**expiration** 39:23 46:23 47:1

**expired** 47:9

**expires** 17:23

**explain** 40:3 45:13 85:3

**explaining** 71:16

**extra** 121:4

**F**

**fabrication** 17:16

**facility** 123:14

**fact** 31:22 35:3 45:20 83:23 86:4,18 87:16 88:8,17 92:5 99:19 100:16 109:24 117:17

**failure** 12:1 46:17

**fair** 6:16 8:14 15:22 37:23 38:25 42:25 68:16 80:24

**fairly** 81:18

**family** 20:25 67:9 100:6

**fashion** 44:8

**father** 49:14

**February** 54:4,8,11

**feel** 129:18 130:9

**feet** 36:19,23 76:6

**Felix** 30:15 32:7,15, 18 63:11,14,20

64:20 65:10,17 67:10 76:17 84:9,24, 25 85:4,10,16,22 88:15,16,17,20 89:4, 6,7,8,10,11,21 92:2,4 96:12,15,20,25 98:8 99:6,10,14,17,21 101:2,4,8,13,17,25 102:3 103:12,19 104:1 107:18,19 108:11 109:21,22 128:6,21 129:4

**Felix's** 92:2 96:17 107:20

**field** 76:10

**fight** 14:12

**figure** 47:4 74:10 96:23 107:22 123:22

**filed** 10:10 100:21

**filing** 97:23

**fill** 77:9

**filled** 22:18 24:6,13, 14

**filling** 118:14

**fills** 80:9

**finally** 74:25

**find** 99:1 106:14 110:4

**fine** 27:25 34:6 38:18 104:11

**fines** 12:2

**finish** 16:17 26:23 32:24,25 43:25 48:18 68:4 83:7 97:7 105:6

**fire** 98:16

**firearm** 13:9

**fired** 89:16 98:12,17, 18,20,25 99:1,4

**firing** 89:14

**fixed** 81:18

**Florida** 39:12,20,24 42:4,6

**Flow** 10:3,4 22:1

**fluctuated** 65:20,21

**folks** 30:14

**football** 76:10

**foreman** 23:25 25:12,13,20 26:9,10 27:20 29:18 33:15, 16 57:23

**foremans** 26:5

**foremen** 25:16 59:7, 12

**forget** 72:18

**forgot** 59:4 90:7

**forklift** 68:19,23 71:16,17

**four-day** 91:1

**Friday** 51:14

**friend** 49:7

**front** 36:4 61:22 84:24,25 87:1 88:15 91:25 95:18 112:7 115:6

**full** 4:12 25:1 113:25 114:14 116:16

**furniture** 100:19

**furthest** 76:4

**G**

**gang** 71:11 78:11,13, 14

**garage** 61:23 95:18 96:4

**gardens** 21:13

**gas** 43:21,23 44:2 127:16,20,25 128:7

**gasoline** 127:16 128:4,10,15

**gather** 77:18

**gave** 24:14 29:18 40:22 47:11 49:7 93:12 103:7,9 104:9, 22 105:13 117:19

**GED** 16:18 17:3,7



Case 6:16-cv-00109-GAP-KRS    Document 31-1    Filed 01/03/17    Page 139 of 145 PageID 301

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                                    Index: general..Joe

**general** 82:8 96:7

**generally** 29:21
30:6 64:12 77:12

**gentleman** 110:10

**George** 28:11

**Georgia** 48:9

**give** 4:3 8:12 22:20
27:8,9 36:14,24
37:15 38:7 47:20
50:24 64:10 67:16
68:24 70:10 73:18
75:7,8 76:6 82:5
102:25 104:2 105:3,
7,10 115:8 121:4,12
124:9,10 126:3

**glue** 62:14,24 69:1,
12 70:7,12,14,17
71:18,24 76:13

**glues** 73:15

**good** 45:17 76:1 97:8

**gotta** 76:7

**grab** 62:6

**grabbed** 61:3

**grass** 99:19

**great** 75:25

**ground** 6:1 78:24
79:3

**guess** 23:16 54:23
65:23 72:7 74:15
75:3 77:14 78:6 80:8
89:5 94:9 112:6
127:21

**gun** 14:12

**guy** 22:22 68:18 69:6
80:8 85:6

**guy's** 25:22

**guys** 28:19 30:21
67:19

---

**H**

**half** 37:18 115:1
126:13

**happen** 31:23 32:3
67:22 70:16 78:9

123:17,18,19,23,24,
25 124:1,7 125:8,24

**happened** 14:9,11
17:12 33:20 58:16
84:7 85:3,12 95:13
116:11 117:23
124:5,19 125:4

**hard** 13:21 26:3

**Hartford** 8:20,23
9:13 13:6 15:22,24
16:4 20:3,18 21:4,6,
10,15,18,19 22:9,21,
25 23:10,14 24:19
25:4,7 28:17,21
36:16,18 37:25
38:14 40:16 42:25
43:3 44:2 50:23
83:22 91:12,24 92:4,
8 94:6 96:7,10,13
99:15 100:14,22
101:6,12 107:13
110:3 111:18 123:2
124:7 126:22,23
128:4,10

**haywire** 90:14

**hazmat** 122:19

**he'll** 116:10

**head** 15:3 64:15
71:23 80:15 82:9
93:5 117:25

**health** 96:16,17,20,
25

**hear** 126:22 127:10
128:13

**heard** 28:5 34:14
86:15 89:13 99:7
113:19,20 127:1,12
128:9,14,16,18,20,
22,24 129:2,3

**hearsay** 126:25

**heavier** 67:18

**held** 13:12 46:3

**helped** 63:6,7,15
65:13,14 66:21,22

**helper** 24:23 78:17
83:12

**helpful** 6:12 109:6,
16,18

**helping** 96:23 99:17

**Hernandez** 27:10,
21

**high** 16:17 17:8
72:23

**Hills** 35:14,15

**hired** 24:6,10,19
35:4 39:5

**hiring** 22:24

**history** 10:19 49:1

**hits** 47:1

**hold** 23:14 69:3

**home** 5:6 35:24
80:2,12,14,18 86:6,
10 123:7

**hour** 16:2 36:12 39:5
51:21 80:22

**hours** 51:20 53:16,
17 121:3,5,6

**house** 14:13,14 35:6
36:4 82:13,20 83:9
86:19,23,25 87:2,8
92:1 94:24 95:6
97:6,13 100:13,19
105:10,22 106:1,22
107:19,20 108:8

**huh-uh** 6:10

**human** 23:16

**Humphries** 4:7,14,
19 5:10 9:11,12
16:17 50:21 66:20
111:17

**hung** 64:1

**hurricane** 10:1,8

**HVAC** 17:10

---

**I**

**ice** 62:14

**ID** 40:8,22 42:6
47:10,15

**idea** 68:24

**identification** 13:2
38:10 39:24 40:6,7,

13 41:1,6,14 50:19
111:15

**imagine** 127:9

**immediately** 19:14
89:10

**important** 6:6

**incarcerated** 17:6

**increase** 115:2,4,9,
19 116:4

**increases** 113:24
114:13

**industrial** 71:1

**inexpensive** 43:23
44:2

**information** 22:24
87:18 104:22 105:7,
14 110:21 112:20
113:11,13

**informed** 22:19
31:4

**initiative** 66:13 77:9

**injury** 10:1 22:3,4

**input** 101:20

**inside** 23:17 95:9,17

**instance** 58:2

**instances** 129:16

**interrogatories**
111:19 112:2
113:12,14 118:3

**interrogatory**
113:9,16 123:11

**interview** 23:9,20,
25

**interviewed** 23:24

**involved** 9:18

**involving** 128:21,25
129:1,4

**iron** 72:18,20,23

**IRS** 96:16,18

**issue** 59:19 91:3
117:3

**issues** 31:14 46:3

67:9 90:21,22 96:18
104:25 109:9
113:23,25 114:14
116:22

---

**J**

**jail** 11:13,15 16:22
17:1 47:13 49:3

**jam** 76:9

**January** 53:4,22
54:1

**Jeff** 23:3 24:16,17
49:13 109:23,24,25
110:4 112:24

**job** 22:14,17 23:18
26:5,19,21 27:1,5
28:25 29:4,6,21,22
30:7,22 31:1,6,10
32:5,16 33:18,23
34:13 41:18 43:1,6,
9,13 44:17,20 48:4,
7,13,22 49:3,8 54:20
67:3,7 68:4,6,14
69:23 70:3,8,13,17,
21,25 73:2 77:19,23
78:1,8 79:7,8,19,25
80:5 81:6,14,15,17,
23 82:12,20 83:8
84:4 89:5 91:6,8,23
118:5,8,20 119:7,8,
12,13,19,22,24
120:3,6 121:9,11,18,
22 129:9

**jobs** 21:2,7,10 69:4
99:20

**Joe** 25:13,14,19
27:14 28:14,17
30:15 33:17 37:5,7
57:21 58:3 60:2
62:1,4 63:1 65:14
67:4,11 68:10 73:12
76:17 83:14,24,25
84:17 85:4,8 86:6,7,
17,25 87:18,21,25
88:15 89:7,11,20
97:10 100:13,14,20,
24 101:8,9,13,14
107:16 108:12,14
113:23 114:12
125:10 126:3,6,8,12
127:19,20 128:21



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES

129:4

**Joe's** 85:24 86:15

**join** 102:17,22

**Jonathan** 4:7,14

**Jorge** 28:11,12 30:15 64:25 65:10, 18

**Joseph** 30:10

**Juan** 30:15 66:14 92:6 125:11

**jug** 77:2

**jugs** 77:10

**July** 28:22 56:13,18

**June** 56:9,12

**jury** 15:16

**Justin** 26:1 79:14

---

**K**

**keys** 61:9,11,13 62:6

**killed** 14:17 15:2,5,8

**KIM** 6:23 7:19 9:7 14:23 15:7,12,15,18 130:4,16

**kind** 16:9 17:8 18:2, 13 19:20 50:25 69:16 70:7 71:15 96:20,25 97:1 122:19 126:24 127:12 128:20

**kinds** 21:10 48:1 128:14

**knew** 22:22,23 23:6 25:5 27:15,16,17 33:14 40:20,24 42:8, 9 66:8 86:14 90:21 97:18 122:23 126:3 128:2,8

**knowledge** 60:5 65:9 68:10 79:6 88:16,19 100:24,25 101:1 108:14,17,25 109:5,15 110:24 111:2,9,11,12

---

**L**

**labor** 30:20 75:13

**laborer** 24:24

**lacquer** 77:2

**lady** 94:17

**laid** 37:22 78:2 86:18 87:16 88:1,16,18,24 89:8 92:10,19 93:19, 23 95:1 96:3 98:17 99:19 101:12 115:1

**large** 71:13

**late** 31:14

**law** 42:8

**lawn** 21:12

**lawsuit** 6:4 9:17,18 10:10 97:22,23 98:6 100:21,25 101:6,10, 15,18 102:10,18,23 103:16,20,24 105:19 106:15 107:24 108:12,15,18 109:5, 7,17 113:22,23 118:18,23

**lawsuits** 10:12

**lawyer** 42:7 45:21

**laying** 86:12 89:14

**layoff** 88:25 89:16 90:11 94:6,11,14 97:16,20 126:13

**learn** 105:18

**learned** 18:11

**leave** 22:6 35:24 64:7,24 65:11 69:23 70:2 73:1,3,19 81:22 101:4 121:18 126:2, 9 129:6

**leaving** 21:19 44:6 68:5

**left** 20:17 35:6 77:12 78:16 79:8 81:16 85:5 89:9 99:15 100:13 107:13 118:24 119:8,13,21 120:6,9,15,22

---

121:10,14,22 125:18 129:14

**left-hand** 51:4

**leftover** 123:13

**letting** 68:11

**license** 12:1 17:17 35:11 39:12,15,20, 25 40:5,7,8,10,12,17 41:9,14,19,24 42:5, 11,22 44:7,11,21 45:16,20,25 46:1,7, 11,12,16,19 47:1,3,4, 7,11,17,18,20,23 49:5 61:16,17,18 90:23

**licenses** 46:23

**lined** 73:24

**lines** 24:25

**lion's** 28:16

**listed** 109:4

**lists** 49:1

**live** 7:13 9:12 35:13 49:19

**lived** 7:9 8:17,22 23:7

**lives** 50:7

**living** 8:19 13:22

**load** 61:23 71:17 72:3,5 74:3,19 75:2, 18

**loaded** 68:21 120:23

**loading** 73:12

**local** 16:21,23

**located** 49:15

**location** 18:21

**locked** 69:23 70:5

**long** 5:16 7:9 8:17 10:19 11:17 12:24 19:3 29:5 37:9 45:8 49:10 54:20 57:22 67:14 75:1 77:19 78:3 89:4 97:5,7 105:24 107:15 122:9 125:16

---

**longer** 47:2 77:22

**lot** 8:11 29:2,6,23 64:16 74:8 75:15 85:13 90:25

**lots** 78:23,25 79:2

**Lovett** 23:22 41:13 87:13,15 89:18 90:3 92:9,10,11 94:7,11, 25 96:2 114:20 115:16 116:4,8,9,14 117:8

**Lovett's** 26:1

---

**M**

**M-a-m-i-e** 9:3

**made** 15:25 16:5 38:14 87:10 103:6 105:12 113:21,24 114:7,13,16

**main** 70:19,20 87:4, 5 101:8

**make** 13:22 35:18,21 36:10 46:13,14 66:17 87:23 91:4 94:9 111:20 130:17

**makes** 6:2 13:21

**Mamie** 9:2

**man** 108:20 126:24

**management** 94:5

**manual** 75:13,14

**March** 54:10,16 55:8,10,15

**mark** 12:25 38:12 41:1,3 124:8

**marked** 13:1 38:9 41:5 50:18,22 111:14,17

**marker** 36:3

**married** 5:10,12,16 50:9

**materials** 61:10,23 63:8 67:17 71:2 122:19 124:14

**matter** 31:22 35:3

---

83:23 86:4 87:23 92:5 99:18 100:16 109:24

**mattered** 87:23

**meaning** 33:7 65:20 98:1 99:17 101:22

**mechanic** 17:15

**Medina** 27:25

**meeting** 105:21,25 122:4 123:2

**meetings** 122:2,3

**members** 20:25

**men** 69:6

**mess** 81:20

**met** 104:1,11

**metal** 17:15 69:3

**middle** 4:15 74:25

**Mike** 31:18,19

**military** 18:15

**Miller** 49:13

**minor** 29:24

**minute** 50:4 53:15 94:23 99:8 102:2

**minutes** 36:12 61:1 67:17 73:17 75:3,9 78:6 80:23 97:8 121:11 122:10 125:17

**miscellaneous** 21:14 46:9

**missile** 13:14

**missing** 68:1 83:16 90:19 116:25 117:6 127:12

**mistaken** 6:20 9:25 63:8 90:6 92:5

**Misty** 23:11,12,14, 20

**Mm-hmm** 4:22 5:22 9:4 13:7 19:17 20:6 38:15 39:17 41:10 51:6,22 52:17 54:25 56:14 60:13,17



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 141 of 145 PageID 303

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES

Index: mom's..Positive

99:11 114:4 118:7
121:20,24 123:8

**mom's** 9:10

**moment** 39:11
50:10,12,24 57:19
101:4 126:17

**money** 46:6 87:24
99:24 100:2 116:23
117:6,21

**month** 19:5 123:20,
21

**months** 5:17 20:4,10
37:18,19,25 115:1,2
126:13,14,15

**Morgan** 94:21

**morning** 6:4 31:2
32:20 35:6,16 37:4
38:4 43:2 60:21
61:8,21,24 62:5 63:2
65:15 67:15 68:9,20
73:12 74:6,11,18
75:17 76:14,16
79:19 81:14,16
84:14 107:10 110:20
111:2 124:24 125:2
129:13

**mornings** 62:2
63:10 67:20 76:19
78:4 83:2 118:24

**mother** 8:8,25 9:14
50:9

**move** 45:1 73:21
74:20 87:23 100:18

**moved** 22:22

**moving** 45:22

**murder** 13:19 14:20

———————

**N**

**nah** 26:14

**nails** 62:14 72:16
73:17

**named** 8:8 10:3
110:4

**names** 27:19

**Naptha** 125:12,14

**naturally** 66:25

**nature** 16:10

**needed** 43:14 45:1,2,
24 61:10 62:15,17,
21,22 67:18 68:6,7,
12 99:18 103:22
105:9,10

**negative** 96:9

**negotiated** 39:6

**neighborhood**
22:23 23:6,7

**nephew** 7:15 8:1,24
9:14

**nephew's** 8:4

**Nick** 27:25

**Ninety-three** 11:21

**nods** 64:15 80:15
82:9 93:5 117:25

**notice** 32:22

**November** 51:17

**number** 5:4 18:23
29:13 39:12,15,21,
25 40:2,6,11 42:5,6,
9,10 103:9,10 104:2,
10 105:9,10,14
107:5,7,18 113:9,16,
18 118:3 123:11

———————

**O**

**Obama** 49:11

**obligations** 46:18

**OBT** 18:22

**obtain** 44:7 45:20
47:23

**occasionally** 30:1
76:17,23

**occupied** 14:16

**occur** 10:6 122:6

**occurred** 95:22
114:23,25 122:7

**October** 22:10
28:22 38:22 39:1
51:13

**odd** 21:2 99:20

**odds** 100:7

**offense** 13:8

**officer** 31:15 47:12

**on-the-job** 18:8

**open** 46:8,10 78:11,
12

**operator** 44:15,19
45:4,17 47:25 48:5

**operators** 48:1

**opportunity** 50:25
130:7

**opposed** 82:13
119:12

**Opposite** 44:4

**Orange** 10:10

**order** 11:23 130:5,
19

**ordered** 130:17

**ordering** 130:6

**Orlando** 4:25 16:25

**overthrown** 11:7,10

**overtime** 16:2 51:20
82:2 109:17 110:22,
23 111:3,11 129:7

**overturned** 11:11,
12 13:20

**owed** 46:6 117:21

**owned** 18:9

———————

**P**

**p.m.** 126:18,19
130:20

**paid** 16:2 48:6,15,19
51:20 54:20 79:7,9
118:19,23 119:7,11,
12,19,20,23 120:5,
12,15,25 121:21

**paint** 72:1

**paper** 17:21 52:5

**paperwork** 63:4
80:9 118:13,14

126:3

**Pardon** 91:16

**park** 80:8 124:20

**parking** 75:15 85:13

**part** 35:13 59:3
64:20 93:24 102:10
103:16,19,23 105:19
106:14 120:2

**party** 113:21

**pay** 12:2 25:5 39:9
46:18 48:5 54:21,22,
23 55:8 60:12 93:15
94:1 113:24 114:13
115:2,4,8,19 116:4
117:17 119:24

**paycheck** 56:8
113:25 114:14
116:16,22 120:24

**payment** 46:14 91:4

**payroll** 50:22 59:21

**people** 6:21 21:13
27:13 28:2,3 30:9
63:23 66:10,20
73:13 75:5,6 78:23,
25 79:2,23 86:12
100:6 101:7,11
103:7 127:6 130:9,
12

**percent** 124:11,12
125:5,22,25

**Perez** 28:6,11

**performance** 83:12

**performed** 119:15

**performing** 78:11

**period** 25:21

**periods** 60:12

**person** 12:20 28:10
32:4 45:16 49:6
66:13 75:13 99:5
110:16

**person's** 12:18,19

**personal** 31:2,6,10
32:5,8,15 33:18,23
34:12,17 35:7,10

**personally** 45:22

**persons** 113:10

**Pete** 88:3,4,6 90:8

**Peter** 90:10 93:9,14,
18,22 94:1,7,11
113:24 114:8,10,13,
18 115:25 116:3,13

**ph** 58:17

**phone** 5:4,6,7 86:20
93:12 98:12 103:6,7,
9,10 104:9 105:9,14
107:5,7

**physical** 118:10
120:21

**pick** 37:5,7,13 126:3

**picked** 68:22 86:20

**picture** 27:23

**pictures** 28:2 120:22

**Pine** 35:14,15

**pipe** 19:24 20:14

**piss** 21:22,24

**pitched** 63:18

**place** 11:20 22:23
68:8

**places** 29:14 65:23
123:14

**plaintiff** 9:16

**plant** 71:1

**plates** 62:15 67:24
69:1,2,12 70:8 71:19
72:13 73:17 76:13

**ply** 69:5

**pocket** 47:12

**point** 47:9 87:22
93:21 104:14 117:22

**points** 88:7

**policy** 44:23,24

**pool** 30:20

**position** 18:25 23:9,
14 24:22 25:3 74:23
75:22

**Positive** 119:1



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES

Index: post..serve

**post** 17:8

**potential** 109:4,18

**pounds** 75:15

**present** 9:14 114:7, 16 115:16 116:3,14, 15 117:10

**presume** 6:15 8:2

**presuming** 68:3

**pretty** 35:23 93:20

**previous** 49:1

**prison** 11:16 40:2 49:4

**private** 61:20

**probation** 31:14

**problems** 56:23 59:13 90:20 96:16, 18,20,25

**processed** 12:3,7

**production** 73:22

**project** 29:22

**property** 61:20

**prosecuted** 10:16, 24 11:2 12:21

**protocol** 62:8

**provide** 43:1 112:20 113:13

**provided** 109:20 118:6

**providing** 113:11

**pull** 61:14,22 64:5

**pulled** 30:1

**purposes** 15:20 33:10

**put** 28:10 39:15 42:6 47:12 61:15 68:25 77:10 82:24 109:22 124:22,25 128:7

**putting** 119:25

**Q**

**quarters** 51:20

**question** 6:13,14,15 26:23 32:24 34:6,11 41:17 43:25 48:18 82:22 83:7 94:10 96:1 105:6 113:18 114:15

**questioned** 94:8

**questions** 6:3,5 7:20 112:7,19,21 130:3,5

**quickest** 80:23

**quit** 81:6,8,10

**R**

**rags** 62:22,23 66:15 77:10

**rain** 56:23

**rained** 56:24 81:11

**raining** 89:1

**random** 22:2

**range** 48:9 89:23

**read** 15:13 113:3 130:8,12,13,14

**reading** 130:8

**ready** 50:17 63:21 64:4,19 65:6,15 67:15

**reason** 8:12 35:9 37:20 41:20 42:3 52:6 63:25 90:25 130:10

**recall** 9:21 11:25 12:12,24 27:19 92:9, 12,15,21 93:4 94:16

**receive** 17:13

**receiving** 113:25 114:14 116:16

**recent** 49:2

**recess** 126:18,19

**recognize** 54:21

**record** 4:13 6:8,10 110:4 127:6

**recorded** 58:1

**records** 50:23 53:19, 20 60:14

**refer** 15:21

**referring** 24:16

**refuel** 124:19

**regard** 110:22 111:3

**regular** 81:9

**reinstate** 47:17

**relative** 92:2

**relayed** 87:18

**remark** 113:21

**remember** 11:23 22:7 34:8 35:21 42:14,15 52:9 58:22 64:11 90:7,17 91:24 93:1,24 95:11 105:23 122:13

**remembered** 109:21

**removed** 91:25 99:18

**repairs** 20:15 29:14, 15,24 76:23,25 77:1

**rephrase** 6:14 119:16

**replace** 124:14

**report** 35:1 43:11 109:15 111:1

**reported** 109:12 110:19

**reporter** 4:2 6:2 7:3

**reporting** 109:14

**represent** 110:3

**require** 122:17,21

**required** 122:14 123:12

**researched** 99:2

**residential** 22:19

**resources** 23:16

**respect** 117:3 122:2 123:1

**response** 85:24 100:3 102:5 115:11

**responsible** 68:11 118:14

**rest** 87:6

**result** 22:3

**return** 123:12,13

**returned** 129:17

**reviewed** 24:4

**Ricardo** 27:10,21

**Rico** 28:4

**ride** 34:22 37:3,17 38:3,8 70:23 79:20 82:20 126:8

**riding** 37:21 62:7 95:14 118:8,19 129:10

**ring** 28:4

**rings** 69:3

**Rintelmann** 90:10 93:9,11,14,18,22 94:1,7,11 113:24 114:8,13,18 115:8 116:3,13,14 117:2

**Rintelmann's** 115:11

**road** 44:9 87:4,5

**robbery** 11:3,9,20 13:8

**rode** 37:24 45:10 48:4 79:24 86:5,6 102:1 107:21 126:6, 12,14 127:19

**rollers** 69:1,12,21 70:8 71:19 72:5 73:16 76:13

**Roman** 32:7,15 33:3 88:15 101:4 103:19 105:19 106:3,21 108:15,18,25 109:1 128:6,21 129:4

**Roman's** 105:22,25 107:5

**roof** 69:22 71:1,12 78:10,18,21 79:3,10,

11 81:17 82:1 117:13 119:5,11,20, 21 120:9,12,14 121:1,14

**roofer** 25:1

**roofing** 22:18

**roster** 117:6

**roughly** 30:12 74:11 92:25 122:10 126:15

**rubber** 77:2

**rule** 82:8

**rules** 6:1

**run** 27:18 69:17 80:22

**running** 68:18 75:16

**S**

**S-t-e-p-s-t-o-n-e** 49:24

**safety** 122:2,3,4 123:2

**sanitary** 20:15

**sanity** 6:7

**sat** 76:21 79:24 95:18

**school** 16:17 17:8

**scratch** 42:5

**screws** 62:15 67:24 68:7

**Seal** 72:25

**seconds** 27:9

**section** 48:25

**security** 40:23

**Seminole** 17:9

**send** 65:22

**sentenced** 13:11

**September** 28:23 52:23 57:3,7,8,12,16 97:12

**serve** 11:6



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                    Index: set..telephone

**set** 81:22 111:19

**Shake** 18:20 19:1,4, 13,14,15 20:16

**shakes** 15:3

**share** 28:17

**shared** 22:23

**sharing** 89:4

**sheet** 17:15 63:9

**shit** 72:10

**shooting** 13:14

**shop** 30:24 31:8 33:9 34:1,4,10 35:5 64:8 114:11 123:12

**short** 25:21

**shorter** 77:22

**shot** 14:3 22:20 49:7

**show** 6:10 28:1 40:25 64:16,23 119:6,10

**showed** 27:23 64:3 65:18

**showing** 65:10 111:17

**shown** 13:4 53:18

**sic** 20:1 26:2 126:25

**sick** 97:1 99:18

**side** 21:7 51:4

**signature** 38:19,22 113:1

**signed** 113:3

**similar** 41:9 84:11

**simple** 45:20

**simply** 76:20 105:3

**single** 66:20

**sir** 7:18,25 9:5 14:8, 10 15:4 20:7 41:2 43:25 48:17,19,23 83:7

**sit** 79:20

**site** 26:19,21,22 27:5 29:21,22 30:7,22,25

31:1,6,10 32:5,16 33:18,23 34:13 43:9, 13 48:4,22 54:20 68:6 69:23 70:3,8, 13,17,21,25 73:2 77:19,23 78:1,16 79:7,8,25 80:5 81:7, 14,15,17,23 82:13,20 83:9 84:4 118:5,9,20 119:7,8,12,13,20,22, 24 120:3,6 121:9,11, 19,22 129:9

**sites** 28:25 29:5,6 43:2,6 44:17,20 48:7,13 67:3 78:8 79:19 89:5

**sitting** 94:17 95:12

**situation** 89:15 111:7,10,11

**size** 71:25

**slow** 86:13 88:25 89:5 90:13,15 92:11 95:24

**slower** 89:2

**Smiley** 30:15 65:24

**smoke** 76:21

**smoked** 63:25

**social** 40:23

**soda** 61:3

**someone's** 14:13

**sorts** 46:5

**South** 8:20,23 9:13 13:6 15:22,25 16:4 20:3,18 21:4,6,10, 15,18,19 22:9,21,25 23:10,15 24:20 25:4, 7 28:17,21 36:16,18 38:1,14 40:16 43:1,3 44:3 50:24 83:22 91:12,24 92:4,8 94:6 96:7,10,14 99:15 100:14,22 101:6,12 107:13 110:3 124:7 126:22,23 128:4,10

**South's** 111:19

**speak** 28:3 45:21 58:21 88:3 90:8,10 93:1,9 94:19 124:4

**speaking** 30:6 64:12

**specific** 101:21 111:12

**specifically** 125:3, 23

**spell** 4:17 7:24 8:4,6 49:23

**spelled** 7:25

**spend** 11:13

**spent** 11:15

**spilled** 70:15

**spoke** 88:2 90:8 93:2 94:19

**sports** 127:24

**sprinkler** 115:15

**square** 117:17

**standing** 85:4,6,10

**start** 39:1 70:10 77:10 78:11 81:19

**started** 25:7 51:12 62:7 85:13 121:16

**starts** 70:21

**state** 4:12 113:10

**statement** 113:21

**station** 37:1

**stay** 25:3 29:21 30:7 38:6 97:5 107:23 128:23

**stayed** 27:13 38:5 70:12

**stays** 73:5

**Steak** 18:20,25 19:3, 13,14,15 20:16

**stealing** 126:23 128:14

**Stephanie** 19:11,12

**Stepin** 49:25

**Stepping** 49:20,22, 25 50:1,2

**stick** 53:20 71:11

**Stone** 49:20,22,25

50:1,2

**stop** 8:9 87:24

**stopped** 37:20

**storage** 78:15

**store** 18:23 36:22 61:3

**storm** 20:15

**stream** 101:8

**street** 38:7 49:19 61:2

**strength** 104:4

**strike** 57:3 81:13

**structure** 13:15

**stuff** 8:12 11:24 20:25 42:3 61:15 62:14 63:19 66:15 67:18 68:22,23 69:11 70:11 75:23 76:2 78:23 79:1,3 89:24 90:14 100:7 107:12 119:25 122:20,24 124:2,23, 24 125:9,18 126:4 127:13 128:18

**Styrofoam** 62:19

**subsequently** 86:17

**substance** 92:21

**sue** 9:22 10:2

**sued** 10:14 15:21

**super** 18:22 57:23

**superintendent** 25:10

**supervisor** 19:10 25:6,9 28:18 53:11 58:9 68:14 111:4

**supervisors** 59:7,11

**supplies** 71:13 123:13

**support** 120:17,20

**supposed** 31:7 34:24 69:25 109:8 120:8 122:8

**supposedly** 11:2

82:1

**surgeon** 18:4,6,7

**surprise** 88:23

**surprised** 88:20

**suspend** 46:16,21 47:8

**suspended** 12:1 42:20 46:12,15,17, 20 47:7 49:6

**swear** 4:2

**switched** 25:18

**sworn** 4:8

**system** 124:8

---

**T**

**T-e-r-r-a-n-c-e** 7:23

**T-h-o-r-n-e** 25:16

**taking** 6:5 44:1 79:4 126:1,22 128:9

**talk** 48:11 53:14 65:10 83:16,24 86:9 88:8,13 90:10 93:18 94:5,10 95:21 102:3 119:5 120:2

**talked** 6:21 23:21,23 59:24 64:1 88:9 92:22 94:2 99:9 101:2,3,5,9,17 102:1,4 103:7 104:4, 6 106:6,9,16,17 108:5,13,19,21 109:1 117:15,16 118:4 123:5 129:22

**talking** 6:7 7:2 20:24 66:10 70:2 96:11 110:17 118:9 120:10 125:2,23 126:11

**tally** 124:8

**Tampa** 43:16,17,19 48:9 49:16 50:7

**team** 25:24 26:21

**tech** 72:23

**telephone** 90:4 92:7



Case 6:16-cv-00109-GAP-KRS   Document 31-1   Filed 01/03/17   Page 144 of 145 PageID 306

Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES                                                                Index: telling..varies

93:4 100:15

**telling** 12:23 27:3 34:9 89:3 109:25 110:11 116:21 124:22

**ten** 29:9,10 42:14,24 74:13 125:7,17

**Tennessee** 48:10

**term** 89:18,20

**terminated** 21:16, 17,20

**terms** 20:21 104:4

**Terrance** 7:21 8:15, 16

**test** 21:22,24 22:2

**testified** 4:9 124:16

**testimony** 4:3 28:16 44:1 48:15,19 65:13 76:12 106:18,20

**text** 100:15 107:3

**texted** 107:9

**texture** 69:6

**theft** 128:21

**thing** 5:25 10:25 13:16 26:3 30:5 32:3 66:8 71:3,15 72:19 73:25 84:9 92:9,12 100:4 126:25 129:2

**things** 6:9 20:20 29:24 46:4,9 63:1 68:21 69:8,9,17,20, 23 70:2 73:11 75:2, 14,21 79:4 88:25 89:2 90:13,15 92:11 109:13 124:21 125:11 128:19 130:11

**thinking** 97:23 98:22 100:21

**Thirty-five** 124:12

**Thorne** 25:14 28:18 30:10 33:17 37:10, 17,21,24 38:4 58:3 59:7 83:14 87:25 89:20 94:23,24 95:2, 3 96:9 97:5,10

100:13,15,20,24 107:9,16 108:2,12, 14,17 113:23 114:7, 12,16 115:6 116:3,7, 13 117:3,7,11 127:19,20 128:21 129:4

**Thorne's** 57:21 97:13 107:7

**thought** 69:25 95:12 102:20 116:1 124:16

**three-** 91:1

**throwing** 13:14 125:17

**thrown** 13:21

**ticket** 42:10

**time** 6:7,22 8:22 9:13 11:6,13,15 12:13,24 13:24 21:5 25:4,19,21 27:13 28:17 29:1 32:14 33:2,19 35:1,4,24 37:7,24 40:1 42:21 43:22 46:2 48:5,6,20 49:5,10 50:23 56:24 57:24 58:4,10,11,15, 16 59:1,8,17,20,24 60:12,20,23 63:16 64:4,7,17,23 65:1,11 66:16,22 67:6,11 70:25 73:4,19 74:2, 4,19,20,22 79:7,8,10 80:19,25 81:6,12,16, 17,22 82:23 83:19 86:22 87:25 88:17 91:19,20 94:13 100:17 101:17 104:2,11,14,15 106:2,4 107:17,21 108:1,6,7 109:12,14 110:19 111:1 115:23,24 116:11,23 117:6,22 118:19 119:7,8,19,21 120:5, 6,8,9,11,12,14,22,25 121:4,22 122:6 123:17 124:12 125:5,22,25 126:21 127:6 128:22 130:19

**timely** 44:8

**times** 26:4 29:23

33:2,8 53:10 57:20 58:5 60:3 63:20,23 65:24 67:23 91:14 97:11,14,17 99:9 100:12,18 108:4,8 109:8 115:22 116:23 117:23 124:2,5,6,21 125:11,19 126:11 127:19

**tin** 71:25

**title** 41:18

**today** 8:23 15:20 106:20 107:1 113:6 129:6

**told** 13:9 26:15 31:7 33:8 34:1,4,8,16,19, 20,23,25 35:2 38:6 39:2 41:22 42:1 43:10,14 47:2,6 59:24 79:9,12,13,14, 16 82:23 83:21,24, 25 84:9,13,17,20,23, 25 85:14,15,16,19,25 86:5,21 87:15 88:15 89:7,13,21 92:13,14 93:3 94:3 95:7,11, 19,23,24 96:2 98:8, 11 99:3 100:4 101:7, 11 102:4 103:5,6,12, 21 104:8,13 106:1, 10,16,22 108:11 117:13 123:16 125:4,21 126:14

**tomorrow** 95:20

**tooken** 117:4

**tools** 69:7,16,18,19 71:19 76:14 78:10, 15 126:3 128:18

**top** 47:12 71:22

**totally** 92:14 96:12, 13

**touch** 93:17 94:3 101:25

**tough** 15:12

**towels** 62:22,23 69:1,11,12 70:8 71:19 72:9 73:16 76:13

**town** 35:13 45:21

48:11,13,20

**trade** 127:4

**traffic** 76:9 77:20 81:5

**training** 18:1,3,5,8, 13 122:15,18,22,25 123:1

**transcribed** 130:7

**transcript** 6:9

**transcription** 130:8

**transfer** 37:2,3 93:11

**transition** 35:18,22 36:10

**transportation** 34:18,22 43:1 63:21 64:24 65:11,19 118:6

**transported** 70:18

**trash** 125:18

**travel** 48:6,20 54:21 55:1 121:4

**traveling** 44:8,10,14 118:5

**tree** 18:4,5,7 21:12 91:7,23,25

**trees** 99:18

**trespass** 12:13,17

**trimming** 91:7

**truck** 44:16,19 45:4 61:9,11,13,14,16,21 62:4,9 65:15 67:3, 14,21 68:21,25 70:20,22 71:1,5,7,8, 14 74:3 75:1,2,9,18, 20 76:2,4,14 79:20 80:9 82:3 85:5 118:10 120:1,6,7,11, 15 121:14,23 123:13 124:13,18,20,21,23, 25 125:9,24 127:21, 24 128:7

**truck's** 75:19

**trucks** 73:19,20 74:8,11,17 77:12 127:17

**true** 113:7 123:16

**truth** 4:4,5

**Tuesday** 51:12,13

**turn** 24:9,12 75:24 115:15

**type** 17:13 18:1 20:12 30:5 32:2 69:21 112:13 127:2

**typed** 112:16

**typing** 6:9

---

U

**uh-huh** 6:9,11 9:8

**uh-uh** 6:12

**uncle** 18:9 20:24

**underground** 19:22,23 20:14

**understand** 6:13 38:18 45:24 70:24 94:9 120:2 129:7

**understanding** 70:22 119:2

**understood** 6:16

**unemployment** 100:8,10

**Universal** 77:25 78:4

**unlawful** 16:6

**unload** 123:13 124:13

**unusual** 82:6 84:8

**Urbana** 28:6,7

**Urbano** 58:23,25

**utility** 127:24

---

V

**vacation** 56:22 93:15 94:1

**valid** 42:21 47:2

**varies** 80:20



Jonathan Humphries & Roman Felix vs. Hartford South LLC
JONATHAN HUMPHRIES

**vary** 81:16

**vehicle** 31:2,6,10 32:5,8,15,20 33:4, 18,23 34:13,17 35:7, 10 129:10

**vehicles** 45:1 128:10

**verbatim** 6:6

**violation** 45:11

**violations** 16:2

**violence** 12:2,4

___

**W**

**wage** 16:2

**wait** 36:10 53:14 75:24

**waited** 86:19 88:12

**waiting** 85:6,8 107:12

**waive** 130:8,9,12,13

**Wal-mart** 18:22

**walk** 87:6

**walked** 61:3 89:12

**walking** 85:13,25 89:13

**Wally** 27:16

**Wally's** 26:13

**Walter** 26:12

**Walter's** 26:11

**wanted** 31:2,6 34:21 44:22 45:21 82:21 91:25 99:23 100:2 102:17

**warehouse** 62:10 74:18 75:19,25 76:5 124:18

**warrant** 91:3

**watching** 32:18

**water** 62:14 67:21 75:4 76:18 77:9 115:15 126:4

**weakness** 104:4

**weapon** 13:24

**weather** 82:7

**week** 19:7 28:15 30:16,17 51:11,14, 16,19,25 52:1,11,16, 22 53:1,5,21,25 54:3,4,7,11,20 55:5, 15,19,22,25 56:3,6,9, 12,18,20,21 57:2,4,8, 12,16

**weekend** 99:19

**weeks** 19:8 60:15 91:1 94:15,16 95:25 114:1,15 116:17

**weight** 75:12

**wet** 70:11

**when's** 42:21 94:13 106:2

**Whichever** 80:23

**Whoa** 42:23

**wide** 89:23

**wintertime** 70:11

**wipe** 62:24

**word** 4:23 14:22 25:12

**words** 26:20 115:12 121:21

**work** 9:13 19:12,25 20:12,24 21:5,10,12 22:24 25:7,20,24 26:1,7,11,13,15 27:14 28:13 29:1 33:12 35:7,16 36:5 43:3 45:8 49:12 53:1 56:3,5,9,12,18,20 57:8,12,16,20 65:14, 15 68:20 70:9 78:18, 20 80:11 81:6 83:17 89:5 90:19 91:1,6,7 93:17 94:4 97:19 99:14 105:14 109:9, 12,14,15 110:20 111:2 114:1,15 116:16 118:10,23 119:14 127:2 129:9, 13,18

**worked** 8:23 16:1 20:3,9,17 21:6 22:25

23:1 26:8,18,19 28:8,15,17,21 29:6 30:9,17 33:3 44:2 46:20 50:23 51:11, 13,16,19 52:1,2,4,11, 15,22,25 53:5,21,25 54:4 55:5,9,14 57:2, 4 58:3,10,16 60:15 77:25 91:12,23 99:6 110:5

**workers** 74:5

**working** 8:19 21:4, 6,9 26:25 27:19 39:1 43:16 45:25 47:5 74:5 84:4,5 98:8 99:10,16 107:10

**workplace** 16:7

**works** 25:8 111:5,6, 7

**worry** 95:20

**wrapping** 77:10

**write** 42:10 57:23 58:4,11 59:1,4,8,17 117:1

**wrong** 68:3 97:3

**wrote** 53:12,17 92:13 112:3

___

**X**

**Xerox** 40:24

**Xeroxed** 41:16

___

**Y**

**yard** 34:21,24 36:23 43:11 60:20 61:7,17, 19 68:5,11,17 71:2 80:6,7,25 82:14,25 91:7 118:24 119:25 121:10 123:6 124:17 126:2,9 129:14,17

**year** 12:15 20:4 42:15,16,17,22 45:9, 10,18 47:17 92:23 115:5

**years** 7:11 8:18 11:18 17:10 42:24

**young** 94:17

**younger** 18:10

___

**Z**

**zip** 5:2

